JINA L. CHOI (N.Y. Bar No. 2699718)
ERIN E. SCHNEIDER (Cal. Bar No. 216114)
  schneidere@sec.gov
JEREMY E. PENDREY (Cal. Bar No. 187075)
  pendreyj@sec.gov
JOHN S. YUN (Cal. Bar No. 112260)
  yunj@sec.gov
MARC D. KATZ (Cal. Bar No. 189534)
  katzma@sec.gov
JESSICA W. CHAN (Cal. Bar No. 247669)
  chanjes@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
Telephone: (415) 705-2500
Facsimile:  (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 3:16-cv-1368 |
| Plaintiff, | **COMPLAINT** |
| v. | |
| JOHN V. BIVONA;  SADDLE RIVER ADVISORS, LLC; SRA MANAGEMENT ASSOCIATES, LLC; FRANK GREGORY MAZZOLA, | |
| Defendants, and | |
| SRA I LLC; SRA II LLC; SRA III LLC; FELIX INVESTMENTS, LLC; MICHELE J. MAZZOLA; ANNE BIVONA; CLEAR SAILING GROUP IV LLC; CLEAR SAILING GROUP V LLC, | |
| Relief Defendants. | |

Plaintiff Securities and Exchange Commission ("the Commission" or "the SEC") alleges:

**<u>SUMMARY OF THE ACTION</u>**

1.     Since October 2013, New Jersey investment adviser, John Bivona, has orchestrated a Ponzi-like scheme that has defrauded investors in up-and-coming technology companies.

2.     Bivona, together with companies he controls, has raised over $53 million in the SRA Funds, which marketed investments in early-to late-stage, pre-IPO technology companies, most of which are based in the San Francisco Bay Area.

3.     Bivona and his companies, Saddle River Advisors, LLC ("Saddle River") and SRA Management Associates, LLC ("SRA Management"), promised SRA Funds investors that their money would be used only to buy shares in the specific pre-IPO companies they were interested in and to pay specified fees.  From the outset, however, Bivona lied to investors and used their money to purchase shares promised to earlier investors in other unrelated funds.  Bivona also used the SRA Funds' bank accounts to pay for a myriad of personal expenses for himself and his family.  By December 2013, the SRA Funds were already short several million dollars.

4.     Bivona and his companies disguised their misconduct by continually transferring money in and out of multiple bank accounts associated with more than a dozen different funds and entities.  Millions of dollars have been funneled to pay for the expenses of earlier funds that Bivona and his companies also manage, while at least $5.7 million has been diverted to family members to pay, among other things, credit card bills, income taxes, a car loan, unrelated defense attorney fees, and the mortgage on a Jersey Shore vacation home.  Bivona and his companies failed to provide investors with the promised financial statements that should have revealed their fraud.

5.     Bivona steered the lion's share of the misappropriated money to benefit Bivona's nephew, Frank Mazzola, who faced SEC fraud charges for an earlier investment scheme, which resulted in the March 2014 entry of permanent injunctions by this Court and the institution of an administrative SEC order barring Mazzola from the securities industry for at least three years.

6.     Bivona is currently generating additional cash by soliciting money for a supposedly new investment vehicle, the Fortuna Fund.  But this "new" fund is run by the same Saddle River

1  employees, and Fortuna Fund investment money has recently been diverted to cover SRA Fund

2  expenses.

3      7.    Bivona and his companies have made material misstatements and have violated, and

4  continue to violate, the antifraud provisions of the federal securities laws.  To halt their fraud and

5  protect current and future investors, the Commission seeks emergency relief in this action, enjoining

6  Bivona's—as well as Saddle River's and SRA Management's—violations of the anti-fraud

7  provisions of the federal securities laws, freezing assets, requiring Bivona and the companies to

8  conduct an accounting, and appointing an independent monitor over Saddle River, SRA

9  Management, the SRA Funds, and other entities holding assets on behalf of the SRA Funds while this

10  litigation is pending and afterwards.

11      8.    In addition to this fraud, the defendants in this case have engaged in a host of other

12  misconduct that violated federal laws and regulations intended to protect the investing public.

13  Accordingly, the Commission also seeks an order permanently enjoining all defendants from further

14  violations of the federal securities laws, requiring defendants to disgorge ill-gotten gains plus

15  prejudgment interest, and imposing civil penalties.

16                  **JURISDICTION AND VENUE**

17      9.    The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the

18  Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], Sections 21(d), 21(e), and 27 of the

19  Exchange Act [15 U.S.C. §§ 78u(d),  78u(e), and 78aa], and Sections 209 and 214 of the Investment

20  Advisors Act [15 U.S.C. §§ 80b-9,  80b-14].  Defendants, directly or indirectly, made use of the

21  means and instrumentalities of interstate commerce or of the mails in connection with the acts,

22  transactions, practices, and courses of business alleged in this Complaint.

23      10.    Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15

24  U.S.C. § 77v(a)], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], and Section 214 of the

25  Advisors Act [15 U.S.C. §§ 80b-14].  Acts, practices, and courses of business that form the basis for

26  the violations alleged in this Complaint occurred in this District.

27      11.    Under Civil Local Rule 3-2(d), this civil action should be assigned to the San

28  Francisco Division because a substantial part of the events or omissions that give rise to the claims

1    alleged herein occurred in San Francisco, San Mateo, and Santa Clara counties.  In particular,

2    numerous SRA Fund investors whom defendants defrauded reside in these counties.

3                                            **DEFENDANTS**

4          12.    **John V. Bivona**, age 75, is a resident of Park Ridge, New Jersey.  From 2009 to 2014,

5    Bivona was a controlling owner and registered representative of Felix Investments.  During all

6    relevant times, Bivona controlled Saddle River and SRA Management, and was a manager of Saddle

7    River, SRA Management, and the SRA Funds.  Bivona is also a member of the New York state bar.

8    He is defendant Frank Mazzola's uncle.

9          13.    **Saddle River Advisors, LLC ("Saddle River")** is a Delaware limited liability

10   company with its principal place of business in Upper Saddle River, New Jersey.  Saddle River

11   formerly conducted business as Felix Advisors, LLC.  Saddle River serves as the investment adviser

12   to the SRA Funds, among other clients.  Saddle River was formerly registered with the Commission

13   from March 2013 through May 2013, but currently files reports with the Commission as an exempt

14   reporting adviser.  In March 2015, Saddle River reported in its Form ADV, filed with the

15   Commission, that it had over $139 million in assets under management.

16         14.    **SRA Management Associates, LLC ("SRA Management")** is a Delaware limited

17   liability company that provides management services to the SRA Funds.  John Bivona commingled

18   money between Saddle River and SRA Management.

19         15.    **Frank G. Mazzola**, age 49, is a resident of Upper Saddle River, New Jersey.

20   Mazzola was a manager of SRA Management until March 2014 and a manager of Saddle River until

21   August 2014.  From 2009 to 2014, Mazzola was a registered representative of Felix Investments and

22   another registered broker-dealer.  In March 2014, this Court entered a final judgment against

23   Mazzola, permanently enjoining him from violating the antifraud provisions of the federal securities

24   laws.  That same month, the Commission instituted an order barring Mazzola from the securities

25   industry with the right to reapply after three years.  In June 2014, the Financial Industry Regulatory

26   Authority ("FINRA") permanently barred Mazzola from acting as a broker or otherwise associating

27   with firms that sell securities to the public.  Mazzola is defendant John Bivona's nephew. John

28

1  Bivona diverted approximately $2.7 million from the SRA Funds to benefit Mazzola and his wife,

2  relief defendant Michele Mazzola.

3  **RELIEF DEFENDANTS**

4  16.     The following individuals and entities are named as relief defendants in this action for

5  the purpose of assuring complete relief.  Each individual or entity received money or other assets that

6  was obtained in violation of the federal securities laws, and without providing bona fide value.

7  17.     **Michele J. Mazzola,** age 47, is a resident of Upper Saddle River, New Jersey.

8  Michele Mazzola is defendant Frank Mazzola's wife.  Since 2013, she and relief defendant Anne

9  Bivona have owned Saddle River and SRA Management.  John Bivona diverted approximately $2.7

10  million from the SRA Funds to benefit Michele Mazzola and her husband, defendant Frank Mazzola.

11  18.     **Anne F. Bivona**, age 70, is a resident of Park Ridge, New Jersey.  Anne Bivona is

12  defendant John Bivona's wife.  Since 2013, she and Michele Mazzola have owned Saddle River and

13  SRA Management.  John Bivona diverted approximately $1 million from the SRA Funds to Anne

14  Bivona.

15  19.     **SRA I LLC; SRA II LLC; and SRA III LLC (collectively, "the SRA Funds")** are

16  Delaware series limited liability companies launched from late 2013 to mid-2014 to invest in the

17  shares of companies that have not yet gone public.

18  20.     **Clear Sailing Group IV LLC** and **Clear Sailing Group V LLC**, (**together, "Clear**

19  **Sailing")** are Delaware limited liability companies that were formed to purchase shares of pre-IPO

20  companies for investment funds managed and advised by Saddle River.  Defendant John Bivona

21  controls Clear Sailing.  The SRA Funds are members, and therefore owners, of Clear Sailing.  The

22  pre-IPO shares, or economic interests in shares, owned by the SRA Funds are held in the name of

23  Clear Sailing.

24  21.     **Felix Investments, LLC** is a Delaware limited liability company with its principal

25  place of business in Upper Saddle River, New Jersey.  Felix Investments was a broker-dealer firm

26  registered with the SEC from 2009 to 2014.  During the relevant time period, John Bivona controlled

27  and owned a majority interest in Felix Investments.  In March 2014, this Court entered a final

28  judgment against Felix Investments, permanently enjoining the firm from further violating the anti-

fraud provisions of the federal securities laws.  That same month, the Commission instituted proceedings against Felix Investments, which resulted in its censure.  Felix Investments closed its doors to business in June 2014, and, in August 2014, FINRA expelled Felix Investments from the securities industry.

## FACTUAL ALLEGATIONS

**A.    Bivona, Mazzola, Saddle River, and SRA Management Solicited Investors to Invest in the SRA Funds.**

22.    In late 2013 and during 2014, Bivona and Mazzola established three investment funds: SRA I, SRA II, and SRA III (the "SRA Funds").

23.    Both Saddle River and SRA Management serve as investment advisers to the SRA Funds.  According to the Investment Management Agreement among Saddle River, SRA Management, and the SRA Funds, SRA Management provides management services to the SRA Funds, while Saddle River provides investment advice to the SRA Funds.  Saddle River and SRA Management receive compensation for the advice they provide to the SRA Funds.  In practice, Bivona has treated SRA Management and Saddle River (the "Saddle River Defendants") as one entity by commingling assets.

24.    The SRA Funds contain several series, and each series purportedly contains shares, or an economic interest in shares, in one or more particular pre-IPO companies (the "pre-IPO interests"), most of which are headquartered in the San Francisco Bay Area.  The SRA Funds are pooled investment vehicles as defined in Rule 206(4)-8(b) of the Advisers Act.  Investor money is pooled together in each of the SRA Funds in order to purchase the pre-IPO interests.  According to each of the SRA Funds' Operating Agreements, they relied on the exclusion in Section 3(c)(1) of the Investment Company Act of 1940 to not be deemed an investment company under the federal securities laws.

25.    Bivona, Mazzola, and others who worked for the Saddle River Defendants solicited investors for the SRA Funds by offering the opportunity to invest in the pre-IPO interests of various not-yet-public companies, like Dropbox, Inc.; Palantir Technologies, Inc.; Bloom Energy; Square, Inc.; Twitter, Inc.; and Box Inc. (the last three of which have since become publicly traded).

26.     According to the Confidential Private Placement Memorandum ("PPM") and Limited Liability Operating Agreement ("Operating Agreement") for each SRA Fund, which is signed by Bivona as manager of SRA Management, the money raised from investors was to be used to purchase pre-IPO interests that would be held in separate "Series," so that investors could make a "separate and distinct investment in a specific company or companies."  Investments in the SRA Funds would be used to obtain an interest in a particular series of the SRA Funds equivalent to a certain number of pre-IPO interests of that particular pre-IPO company.

27.     Investors in the SRA Funds hoped to make money on their investment from a "liquidity event" at one of these pre-IPO companies—either through an acquisition of that company by another company or through the company's initial public offering.  If this liquidity event caused the shares to be valued at more than what the SRA Funds paid for the pre-IPO interests, plus expenses, investors would receive a return on their investment.  Investors paid to obtain an interest and receive an eventual distribution only for their particular series.

28.     From October 2013 through at least November 2015, Bivona and the Saddle River Defendants actively solicited investors to invest in the SRA Funds by, among other things, sending emails to large groups of prospective investors, touting an opportunity to invest in one of the many series contained in the SRA Funds.  Frank Mazzola, Bivona's nephew, sent over fifty emails to prospective investors soliciting investments in the SRA Funds from October 2013 through at least August 27, 2014.

29.     To date, Bivona, Mazzola, and the Saddle River Defendants have raised a total of approximately $53.4 million from investors for the SRA Funds, many of whom reside in the San Francisco Bay Area.

**B.     The Confidential Private Placement Memoranda ("PPM") and Operating Agreements Distributed to Investors Authorized the Saddle River Defendants to Collect Fees and Outlined their Obligations to Investors.**

30.     Bivona directed the Saddle River Defendants to send prospective investors a Subscription Booklet that contained, among other things, a PPM as well as the respective SRA Fund Operating Agreement.  The SRA Subscription Booklets note that executed documents can be sent to

Bivona's attention and that "[i]nquiries should be directed to" Bivona.  Bivona is also one of two individuals named as managers of the SRA Funds.  Bivona also, in his role as manager of SRA Management, countersigned the signature pages of the SRA Funds' Operating Agreements, subscription agreements with investors, and accredited investor questionnaires.  The SRA Funds' PPMs state that they may not be shared without the permission of Saddle River or SRA Management.

31.     According to the PPM and Operating Agreement for each SRA Fund, the Saddle River Defendants may charge investors in the SRA Funds various "front-end fees," including a "management fee" of 2% of the investment amount, a "due diligence fee" of between 1-5% of the investment amount, and an "expense fee" of 1% of the investment amount.  After the first year, an investor must also pay the Saddle River Defendants an additional "management fee" of 2% of the investment amount per year, 0.5% to be charged quarterly during the life of the funds, but paid at the time of a liquidity event.  The Operating Agreement of each SRA Fund states that the managers will be responsible for paying the operating costs of the fund.

32.     The Saddle River Defendants also charge investors in the SRA Funds a "back-end fee," which equals a percentage of the net profits realized by investors, usually 20%.

33.     The Saddle River Defendants negotiate the front-end and back-end fees separately with each SRA Fund investor, and frequently waive or discount one or more of these fees.

34.     While the Operating Agreement of each SRA Fund gives discretion to "the Manager," SRA Management—and hence to Saddle River as well since Bivona treated them as one company— to conduct the business of the funds, they do not permit the Manager to make loans to other funds or other entities or to receive any fees other than the ones enumerated in the Operating Agreement.

35.     The PPM and Operating Agreement promised investors that Bivona, Saddle River and SRA Management would maintain "proper and complete records . . . in accordance with generally accepted account principles" and provide investors with annual financial statements prepared in substantial accordance with generally accepted accounting principles by a firm of independent certified public accountants of recognized national standing.  The SRA Funds' investors have never received the promised annual financial statements.

### C.      The SRA Funds Purchased Pre-IPO Interests through Clear Sailing.

36.      The SRA Funds did not directly purchase the pre-IPO interests.  Instead, Bivona purchased the pre-IPO interests on behalf of the SRA Funds through Clear Sailing.  Accordingly, Bivona routed millions of dollars of investor money through Clear Sailing.  According to joinder agreements between Clear Sailing and the SRA Funds, the SRA Funds are "members," and therefore owners, of Clear Sailing.

37.      During the relevant time period, Bivona controlled the bank accounts for Clear Sailing, the Saddle River Defendants, and the SRA Funds and authorized all of the money transfers from those accounts.

38.      Although Bivona controls the Saddle River Defendants and their bank accounts, in 2013—during the pendency of the earlier SEC fraud action against Mazzola—Bivona and Mazzola transferred ownership of both SRA Management and Saddle River to their wives, relief defendants Michele Mazzola and Anne Bivona, neither of whom have any experience in the securities industry or at investment advisers or broker-dealer firms, and neither of whom has performed any work for Saddle River, SRA Management, or the SRA Funds.

### D.      Bivona Misappropriated Over $5.7 Million of Investor Money to Benefit Himself and His Family.

39.      The SRA Funds' Operating Agreements permitted money to be used to purchase pre-IPO interests or to pay the agreed-upon fees.  However, Bivona diverted millions of dollars of investor money to himself and family members that far exceeded the fees to which the Saddle River Defendants were entitled.

40.      For example, between October 2013 and December 31, 2013, Bivona transferred $364,000 of SRA Fund investor money to Mazzola, but the front-end fees received by the Saddle River Defendants totaled only $15,000.  Thus, in the first two months of the SRA Funds, Mazzola pocketed $349,000 more than the SRA Funds were allowed to receive in fees.

41.      Similarly, in March 2014, Bivona diverted $795,000 to Mazzola and relief defendant Michele Mazzola, $495,000 of which came from the SRA Funds (and the other $300,000 came from Clear Sailing).  Yet by March 2014, the Saddle River Defendants had only earned $208,000 in front-

1   end fees from the SRA Funds. By the end of March 2014, therefore, Bivona funneled to the Mazzolas

2   at least $859,000 from SRA Fund money ($364,000 through December 2013 plus $495,000 in March

3   2014), even though the total SRA Fund front-end fees through March equaled only $208,000.

4         42.     All told, between October 2013 and January 2016, Bivona funneled $2.7 million to the

5   Mazzolas originating from the SRA Funds.  Bivona steered some of these payments to pay for the

6   Mazzolas' car loan, taxes, and mortgage on their second home.

7         43.     Bivona also diverted almost $1 million of SRA Fund investor money to his wife, relief

8   defendant Anne Bivona.

9         44.     Bivona testified that the money paid to Anne Bivona and Michele Mazzola

10   represented profit distributions.  But, in fact, the money was not paid for value received or as

11   "profits" from the business.  According to internal accounting records, of which Bivona is aware, the

12   Saddle River Defendants have suffered net losses every year since 2013 and their balance sheets

13   reflect negative equity of over $1 million.

14         45.     In addition to improperly diverting investor money to his wife and the Mazzolas,

15   Bivona diverted another almost $2 million of SRA Fund investor money to pay for legal fees incurred

16   on behalf of Felix Investments, Mazzola, and other individuals relating to work they performed while

17   at Felix Investments and on an oil and gas project in which Mazzola is involved that has nothing to

18   do with the SRA Funds.

19         46.     Between October 2013 and January 2016, the Saddle River Defendants were entitled

20   to $1.9 million in total fees.  But Bivona and the Saddle River Defendants steered $2.7 million of

21   SRA Fund investor money to the Mazzolas; $1 million to Anne Bivona; and $2 million to law firms

22   to pay for legal fees for work performed for Felix Investments.  Additionally, Bivona and the Saddle

23   River Defendants had the SRA Funds pay for expenses that should have been paid by Saddle River or

24   SRA Management out of fees earned from the SRA Funds.

25         47.     Thus, Bivona and the Saddle River Defendants diverted at least $5.7 million for his

26   own benefit or the benefit of his family—at least $3.7 million more than the fees the Saddle River

27   Defendants could possibly be entitled to.

28

48.     Bivona knew, or was reckless in not knowing, that the SRA Funds' Operating Agreements did not authorize him to use SRA Fund money in this way.  He also knew, or was reckless in not knowing, that he was not using investor money in the way that was described in the SRA Funds' PPM.

**E.     Bivona and the Saddle River Defendants Misappropriated SRA Fund Money To Pay Earlier Investors And Prop Up Earlier Funds.**

49.     Bivona and the Saddle River Defendants also have improperly diverted SRA Fund money to fund other earlier Bivona-controlled funds, other Bivona-affiliated entities, and even other unrelated entities.  They also have improperly commingled money between and among SRA I, SRA II, and SRA III.

50.     Large investor money transfers went to earlier Bivona funds in true Ponzi fashion.  For example, in November 2013, within a few weeks of launching SRA I, Bivona started transferring money from SRA I to an earlier Bivona-controlled fund called NYPA II.  By the end of November 2013, Bivona had transferred $985,000 from SRA I to NYPA II.  By the close of December 2013, Bivona transferred almost $2.1 million from SRA I to NYPA II and another affiliated fund, NYPA I (together with NYPA II, the "NYPA funds") to cover shortfalls in these earlier funds—to buy shares for, and pay back, earlier investors in other non-SRA related funds.

51.     SRA I also received money from these NYPA funds in order to pay for upfront costs, but the money going out of the SRA I account far exceeded the money coming in.  Between October 2013 and December 2013, Bivona transferred a net of approximately $1.4 million from SRA I to the NYPA funds.  Between October 2013 and September 2014, Bivona diverted a net of at least $2 million from all three SRA Funds to the NYPA funds.

52.     Even though investors had deposited over $4.7 million into SRA I by the end of December 2013, the SRA I bank account had only $35,000 remaining at that time.  Over $2.8 million of this investor money was diverted to uses other than to purchase pre-IPO interests for SRA I investors.

53.     In an effort to mask the misuse of funds, Bivona called many of these unauthorized money transfers "loans" in the Saddle River Defendants' internal accounting records. These "loans" were not documented and had no terms.

54.     Since 2013, investor money from the SRA Funds has constantly been used for purposes unrelated to the SRA Funds. At times, the balances in their bank accounts dipped to $1,000 or less. When one fund did not have enough money to pay expenses, Bivona transferred money from another fund's bank account. That second fund's bank account would then be depleted, and Bivona would transfer money from the third fund's bank account. This quickly led to a "waterfall" effect in which there were always shortages in fund accounts, leading to ever more unauthorized transfers.

55.     Bivona frequently transferred money from one fund to another such that the SRA Funds used investor money for purposes never disclosed to investors, including to pay back another fund's investors when a deal to purchase pre-IPO interests fell through, to purchase shares for the benefit of other funds, or to pay for another fund's operating expenses.

56.     Bivona knew, or was reckless in not knowing, that the SRA Funds' Operating Agreements did not authorize him to use SRA Fund money in this way. He also knew, or was reckless in not knowing, that he was not using investor money in the way that was described in the SRA Funds' PPM.

**F.      Bivona Has Been Rapidly Dissipating Assets, and Is Attempting to Quickly Generate Cash Through the New Fortuna Funds.**

57.     In March 2015, Bivona represented in sworn testimony before Commission staff that he was closing Saddle River and leaving the securities industry. And, in late October 2015, Bivona sent an email to some investors informing them that he was closing Saddle River and would not be accepting any new investments in the SRA Funds.

58.     But, according to bank records and an investor welcome letter, on January 27, 2016, the SRA Funds received $150,000 from an investor for an investment in a series containing shares of a technology company.

59.     Bivona also has begun actively soliciting investments in the Fortuna Fund, a fund recently launched by Saddle River employees. Bivona—who purportedly acts as "general counsel"

to the Fortuna Fund— has sent solicitation emails—through March 2016—from a Fortuna Fund email address, "jbivona@fortunafunds.com," as well as from his law firm's email address, imploring people to invest in a host of pre-IPO companies through Fortuna.  For example, in a February 2016 email sent from his Fortuna email account, Bivona targeted an SRA Fund investor: "we have a block of Palantir stock at $8.00 per share which is a great price and the terms are even better. . . .  [A]nyone who takes advantage of this opportunity will make a killing. . . .  Best Regards, John Bivona The Fortuna Funds."

60.    This email reveals that Bivona's Fortuna Fund phone number is the same one provided to SRA Funds investors in their subscription agreement welcome letter, and the Fortuna Funds has the same street address as earlier Bivona-controlled funds.

61.    In continuing the Ponzi-like nature of the scheme, in January 2016, the Fortuna Fund transferred approximately $75,000 of investor money to Saddle River and SRA II.  Bank statements show that Bivona used at least $50,000 to pay the Saddle River Defendants' operating expenses.

62.    As of January 29, 2016, the Saddle River Defendants had just $50,000 in their combined two bank accounts, with only $69 remaining in SRA Management's account.

63.    The SRA Funds' bank accounts are similarly depleted.  Putting aside the $150,000 that was recently received from an investor, as of late January 2016, the SRA Funds had a combined $6,000 left in their three bank accounts.

### G.    Defendants Also Have Violated an SEC Order and SEC Registration Requirements.

64.    In addition to the fraud committed by Bivona, Saddle River and SRA Management, Mazzola has violated an administrative order issued by the Commission barring him, with a right to reapply in three years, from the securities industry.  He also, along with Bivona, Saddle River, and SRA Management, has violated the registration provisions of the federal securities laws in connection with their offering of the SRA Fund interests.  Finally, Saddle River and SRA Management have violated the broker-dealer registration requirements.

1

2

### 1.    Mazzola Violated an SEC Bar Order, Yet Bivona Permitted Him to Remain Associated with Saddle River.

3

4

5

6

7

8

65.    In March 2012, the SEC filed an enforcement action in this Court against Mazzola and two affiliated entities alleging fraud and misappropriation of investor money.  On March 10, 2014, this Court entered final judgments against the defendants and permanently enjoined the defendants from violating the anti-fraud provisions of the federal securities laws.  In a separate administrative action, on March 20, 2014, the SEC instituted an order barring Mazzola from the securities industry with the right to reapply after three years (the "SEC Bar Order").

9

10

11

12

66.    The SEC Bar Order included a carve-out period during which Mazzola was permitted to remain associated with Felix Investments and Saddle River (together, the "Felix Entities") until August 31, 2014 (hereinafter "Carve-Out Period"), for the sole purpose of winding down his affairs at both firms.

13

14

15

16

17

67.    The SEC Bar Order also included "undertakings." The SEC Bar Order required that during the Carve-Out Period Mazzola was not permitted to raise new capital, request additional funds from existing investors, or solicit any existing investors to roll their current investment into any other investment with the Felix Entities.  And the SEC Bar Order prohibited Mazzola from receiving any compensation for the limited work he was permitted to perform during the Carve-Out Period.

18

19

68.    The SEC Bar Order stated further that if Mazzola violates any of the undertakings, he would be subject immediately to the terms of the bar order without any Carve-Out Period.

20

21

22

69.    Almost immediately after the March 2014 SEC Bar Order against him, Mazzola violated that order by, among other things, raising capital for the SRA Funds and providing investment advice to other investment funds.

23

24

25

26

27

70.    Since March 20, 2014, Mazzola has sent over fifty emails to prospective and existing investors of the SRA Funds encouraging them to invest in the SRA Funds or asking them to roll over existing investments into new investments with the funds.  Some of these emails were sent to hundreds of investors.  Others were directed at individual investors and implored those investors to transfer money quickly to secure placement in the funds.

28

71.     For instance, on March 31, 2014, just days after the institution of the SEC Bar Order, Mazzola sent an email soliciting an investor to purchase securities through Saddle River, asking: "Do you have an interest in Alibaba?" Mazzola followed up with emails that same day and the next, April 1, 2014—copying other Saddle River employees—asking that investor to send $500,000: "Felix has [the Alibaba shares] at $55 per share and Felix is cutting their normal fees in half in consideration of the short duration of the investment.…  [T]his is a big position for us and we need to close it as quickly as possible.  There is a huge demand away from us and they will bid this stock right up to the IPO price because everyone is convinced it will double day one.  When do you think you can wire funds?  Thanks Frank."

72.     Because Mazzola violated an undertaking of the SEC Bar Order by soliciting investors as early as March 31, 2014, Mazzola was required to disassociate himself from Saddle River and the related entity, Felix Investments, at that time.  But Mazzola did not resign from Felix Investments until June 2014 and further did not resign from Saddle River until August 2014.

73.     Bivona knew about the SEC Bar Order when it was instituted.  From March 20, 2014 to August 27, 2014, only Bivona and Mazzola controlled Saddle River, and Bivona has controlled SRA Management during the entire relevant timeframe.  None of Bivona, Saddle River, or SRA Management took any steps to supervise Mazzola's activities at Saddle River or Felix Investments during the Carve-Out Period.  Bivona also knew, or was reckless in not knowing, that Mazzola was soliciting prospective investors during the Carve-Out Period.  Thus, after the SEC Bar Order, Bivona continued to allow Mazzola to remain associated with Saddle River.

74.     In late 2014, Mazzola also formed a new firm, called Silverback Management Limited, which launched new funds in the Cayman Islands and Bermuda, called the Silverback Funds.  Emails sent from Mazzola's Silverback Funds email account employed a similarly urgent tone in soliciting investors to purchase securities.  One such email stated: "I want you [to] send us $2 million to put into Lookout and Evernote.  If you give us the shot we will waive all the front-end and management fees and leave in place only the performance fee.  In addition we will give you a 12 month put on the investments.  At any time over the next 12 months if you want out you can put the investments back to us at cost—no questions asked. Lookout, Evernote and Palantir (we are out of

Palantir stock) are 2015 liquidity events so we only need 12 months!"  Mazzola sent this email to multiple investors.  Mazzola's emails were sent to numerous investors who reside in the United States.

75.     Mazzola made these solicitations from the United States, and email solicitations with Mazzola's Silverback contact information were sent to U.S. investors.

76.      In further disregard of the SEC Bar Order, Mazzola drafted emails that he directed other Saddle River employees to send to prospective and existing investors.  In one such email, purportedly from Bivona, Mazzola encouraged investors to invest in a particular pre-IPO company; the email was signed "Best, Frank."  Bivona was also copied on an email sent by Mazzola discussing the merits of a possible investment.

77.     In violation of the SEC Bar Order, Mazzola has also continued to provide investment advice to the Silverback Funds.  He has opined about which pre-IPO companies' shares the Silverback Funds should acquire.

78.     Also, notwithstanding the SEC Bar Order prohibiting Mazzola from receiving compensation for work done on behalf of the Felix Entities after March 20, 2014, Bivona, Saddle River, and affiliated entities paid almost $3.2 million to Mazzola, or for his benefit, between March 20, 2014 and January 26, 2016, for work performed after the SEC Bar Order was instituted.

### 2.     Bivona, Mazzola, and the Saddle River Defendants Offered and Sold SRA Fund Securities Without Filing a Registration Statement.

79.     Bivona, Mazzola, and the Saddle River Defendants raised over $14 million from investors from March 10, 2014, when Mazzola was permanently enjoined from violating the anti-fraud provisions of the federal securities laws, until August 27, 2014, when Mazzola resigned from Saddle River.

80.     No registration statement was filed for this offering, as was required.

81.     The Form Ds filed by the SRA Funds with the Commission indicate that the funds relied on the "private placement" exemption from registration under Regulation D, Rule 506(c) of the Securities Act.

82.     But the SRA Funds are disqualified from claiming an exemption under Rule 506(c) of Regulation D.  This is because under Regulation D, Rule 506(d), a "Covered Person" of the SRA funds had a "Disqualifying Event."

83.     Mazzola is a "Covered Person" because he was an investment manager and promoter of the SRA Funds from March 10, 2014 to August 27, 2014.

84.     Mazzola had a "Disqualifying Event" on March 10, 2014, when this Court entered a final judgment against him, permanently enjoining him from committing further violations of the federal securities laws.

85.     No other exemption from registration applies.

### 3.     The Saddle River Defendants Failed To Register With The SEC As Brokers.

86.     Bivona and other employees of the Saddle River Defendants acted as brokers while soliciting investors for the SRA Funds.  They had all previously been engaged in the same solicitation activities at Felix Investments, a former registered broker-dealer.

87.     Several people who worked for the Saddle River Defendants actively solicited investors, provided valuation advice, opined on the merits of investments, and received orders and money from investors.  These salespeople were not paid a salary, but were instead paid commissions—noted in the Saddle River Defendants' accounting records as "commission expenses"—equal to a percentage of front-end fees.  Bivona testified under oath that the commissions were equal to 50% of the due diligence fees received by SRA Management from the SRA Funds for those investors they introduced to the funds.  Bivona also testified that he and Mazzola were eligible to receive these commissions.

### FIRST CLAIM FOR RELIEF
**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5 by Bivona, Saddle River and SRA Management)**

**(Fraud in the Purchase or Sale of Securities)**

88.     The Commission realleges and incorporates by reference paragraphs 1 through 87.

89.     Defendants Bivona, Saddle River, and SRA Management, by engaging in the conduct set forth above, directly or indirectly, by use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national security exchange, with scienter: employed devices, schemes, or artifices to defraud; and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, in connection with the purchase or sale of securities. Defendants Bivona, Saddle River and SRA Management also made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

90.     By reason of the foregoing, these defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5], and unless restrained and enjoined will continue to violate these provisions.

91.     By reason of the foregoing, defendant Bivona knowingly or recklessly provided substantial assistance to defendant Saddle River's and/or defendant SRA Management's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5], and thereby aided and abetted such violations, and unless restrained and enjoined will continue to violate these provisions.

### SECOND CLAIM FOR RELIEF

**(Violation of Section 17(a) of the Securities Act by Bivona, Saddle River, and SRA Management)**

**(Fraud In Connection With the Offer or Sale of Securities)**

92.     The Commission realleges and incorporates by reference paragraphs 1 through 91.

93.     Defendants Bivona, Saddle River, and SRA Management have, by engaging in the conduct set forth above, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails:  (1) with scienter, employed devices, schemes, or artifices to defraud; (2) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not

misleading; and (3) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

94.     By reason of the foregoing, defendants Bivona, Saddle River, and SRA Management have directly or indirectly violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and unless restrained and enjoined will continue to violate these provisions.

95.     By reason of the foregoing, defendant Bivona knowingly or recklessly provided substantial assistance to defendant Saddle River's and/or defendant SRA Management's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and thereby aided and abetted such violations, and unless restrained and enjoined will continue to violate these provisions.

### THIRD CLAIM FOR RELIEF

**(Violations of Sections 206(1) and (2) of the Advisers Act by Bivona, Saddle River, and SRA Management)**

**(Fraud by Investment Adviser)**

96.     The Commission realleges and incorporates by reference paragraphs 1 through 95.

97.     By engaging in the acts and conduct alleged above, defendants Bivona, Saddle River, and SRA Management, directly or indirectly, through the use of the mails or the means or instrumentalities of interstate commerce, and while engaged in the business of advising others for compensation as to the advisability of investing in, purchasing, or selling securities: (1) with scienter employed devices, schemes, and artifices to defraud clients or prospective clients; and (2) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients.

98.     By reason of the foregoing, defendants Bivona, Saddle River, and SRA Management have violated and, unless restrained and enjoined, will continue to violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§80b–6(1) and 80b–6 (2)].

99.     By reason of the foregoing, defendant Bivona knowingly or recklessly provided substantial assistance to defendant Saddle River's and/or defendant SRA Management's violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§80b–6(1) and 80b–6 (2)], and thereby

1  aided and abetted such violations, and unless restrained and enjoined will continue to violate these

2  provisions.

3  **FOURTH CLAIM FOR RELIEF**

**(Violations of Section 206(4) of the Advisers Act and Rule 206(4)–8 Thereunder by Bivona,
Saddle River, and SRA Management)**

4

5  **(Fraud on Investors in Pooled Investment Vehicle)**

6       100.    The Commission realleges and incorporates by reference paragraphs 1 through 99.

7       101.    The SRA Funds are pooled investment vehicles, as defined in Rule 206(4)–8 of the

8  Advisers Act, engaged primarily in the business of investing, directly or indirectly in securities.

9       102.    By engaging in the acts and conduct alleged above, defendants Bivona, Saddle River,

10  and SRA Management, while acting as investment advisers to a pooled investment vehicle, by the use

11  of the means instrumentalities of interstate commerce and of the mails, directly and indirectly,

12  engaged in transactions, practices, and courses of business which operate as a fraud or deceit upon

13  investors in the SRA Funds. Bivona, Saddle River, and SRA Management have made untrue

14  statements of material fact or omitted to state material facts necessary to make the statements made,

15  in light of the circumstances under which they were made, not misleading to an investor or

16  prospective investor in the pooled investment vehicle or otherwise engaged in acts, practices, or

17  courses of business that are fraudulent, deceptive or manipulative with respect to an investor or

18  prospective investor in the pooled investment vehicle.

19       103.    By reason of the foregoing, defendants Bivona, Saddle River, and SRA Management

20  have violated, and unless restrained and enjoined will continue to violate, Section 206(4) of the

21  Advisers Act [15 U.S.C. §80b-6(4)] and Rule 206(4)–8 thereunder [17 C.F.R. §275.206 (4)–8].

22       104.    By reason of the foregoing, defendant Bivona knowingly or recklessly provided

23  substantial assistance to defendant Saddle River's and/or defendant SRA Management's violations of

24  Section 206(4) of the Advisers Act [15 U.S.C. §80b-6(4)] and Rule 206(4)–8 thereunder [17 C.F.R.

25  §275.206 (4)–8], and thereby aided and abetted such violations, and unless restrained and enjoined

26  will continue to violate these provisions.

27

28

### FIFTH CLAIM FOR RELIEF

### (Violation of the March 2014 SEC Bar Order)

105.   The Commission realleges and incorporates by reference paragraphs 1 through 104.

106.   By engaging in the acts and conduct alleged above, defendant Mazzola willfully became or was associated with an investment adviser and/or broker-dealer without the consent of the SEC.  When defendant Mazzola engaged in the conduct described above, the SEC Bar Order was in effect and he knew, or in the exercise of reasonable care, should have known of the existence of the SEC Bar Order.

107.   By engaging in the conduct described above, defendant Mazzola has violated, and unless restrained and enjoined will continue to violate, the SEC Bar Order.

### SIXTH CLAIM FOR RELIEF
### (Violation of Section 203(f) of the Advisers Act and Section 15(b)(6)(B)(i) of the Exchange Act by Mazzola)

### (Associating With an Investment Adviser or Broker-Dealer Firm While Barred)

108.   The Commission realleges and incorporates by reference paragraphs 1 through 107.

109.   By engaging in the acts and conduct alleged above, defendant Mazzola violated, and unless restrained and enjoined will continue to violate, Section 203(f) of the Advisers Act [15 U.S.C. § 80b-3] and Section 15(b)(6)(B)(i) of the Exchange Act [15 U.S.C. § 78o] by willfully continuing to associate with Saddle River Advisors and SRA Management without consent of the Commission while subject to the SEC Bar Order.

### SEVENTH CLAIM FOR RELIEF
### (Violation of Sections 203(f) of the Advisers Act and Section 15(b)(6)(B)(i) of the Exchange Act by Bivona)

### (Aiding and Abetting Association of Barred Individual)

110.   The Commission realleges and incorporates by reference paragraphs 1 through 109.

111.   By engaging in the acts and conduct alleged above, defendant Bivona knowingly or recklessly provided substantial assistance to Mazzola's violations of Section 203(f) of the Advisers Act [15 U.S.C. § 80b-3] and Section 15(b)(6)(B)(i) of the Exchange Act [15 U.S.C. § 78o], and

thereby aided and abetted such violations, and unless restrained and enjoined, will continue to violate these provisions.

## EIGHTH CLAIM FOR RELIEF

### (Violation of Sections 203(f) of the Advisers Act by Bivona, Saddle River, and SRA Management)

### (Permitting Association by Barred Person)

112.    The Commission realleges and incorporates by reference paragraphs 1 through 111.

113.    By engaging in the acts and conduct alleged above, defendants Bivona, Saddle River, and SRA Management also violated, and unless restrained and enjoined will continue to violate, Section 203(f) of the Advisers Act [15 U.S.C. §80b-3] by permitting Mazzola, a barred individual, to become or remain associated with Saddle River and SRA Management without consent of the Commission.  Defendants Bivona, Saddle River, and SRA Management knew, or in the exercise of reasonable care, should have known of the terms and prohibitions against Mazzola in the SEC Bar Order.

## NINTH CLAIM FOR RELIEF

### (Violation of Sections 5(a) and 5(c) of the Securities Act by Mazzola, Bivona, Saddle River, and SRA Management)

### (Offering and Selling Securities Without Filing a Registration Statement)

114.    The Commission realleges and incorporates by reference paragraphs 1 through 113.

115.    By engaging in the acts and conduct alleged above, defendants Mazzola, Bivona, Saddle River, and SRA Management, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and to sell securities through the use or medium of a prospectus or otherwise when no valid registration statement had been filed or was in effect as to such offers and sales of such securities and no exemption from registration was available.

116.    No registration statement has been filed with the SEC or has been in effect with respect to any of the offerings or securities alleged herein, and no exemption from registration applies.

117.    By reason of the foregoing, defendants Mazzola, Bivona, Saddle River, and SRA Management, directly or indirectly, violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U. S. C. §§77e(a) and 77e(c)].

## TENTH CLAIM FOR RELIEF
### (Violation of Sections 15(a) the Exchange Act by Saddle River and SRA Management)
### (Failure to Register as a Broker-Dealer)

118.    The Commission realleges and incorporates by reference paragraphs 1 through 117.

119.    By engaging in the acts and conduct alleged above, defendants Saddle River and SRA Management, while acting as brokers or dealers, effected transactions in and induced and attempted to induce the purchase or sale of securities when they were not registered with the Commission as a broker or dealer or associated with an entity registered with the commission as a broker or dealer.

120.    By reason of the foregoing, defendants Saddle River and SRA Management have directly or indirectly violated, and unless restrained and enjoined will continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. §78o(a)].

## ELEVENTH CLAIM FOR RELIEF
### (Relief Defendants)

121.    The Commission realleges and incorporates by reference paragraphs 1 through 120.

122.    Relief defendants Michelle Mazzola, Anne Bivona, SRA I, SRA II, SRA III, Clear Sailing Group IV, Clear Sailing Group V, and Felix Investments received and may continue to hold investor funds, or assets purchased with investor funds, that were obtained through violations of the federal securities laws, as alleged above.

123.    Defendants Bivona, Saddle River, and SRA Management have transferred to relief defendants money derived from the fraud described in this Complaint, to which relief defendants have no legitimate claim.  Money from the SRA Funds was used to make payments unrelated to the SRA Funds, and not permitted by the Operating Agreements of the SRA Funds.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

I.

1       Enter an order restraining and enjoining defendants Bivona, Saddle River, and SRA

2 Management temporarily, preliminarily, and permanently from directly or indirectly violating Section

3 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §

4 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and sections 206(1), (2), and (4) of the

5 Advisers Act [15 U.S.C. §§80b–6(1), (2), (4)].

6                                                              II.

7       Enter an order restraining and enjoining defendants Bivona, Saddle River, and SRA

8 Management, temporarily, preliminarily, and permanently from, directly or indirectly, soliciting any

9 person or entity to purchase or sell any security or security-based swap.

10                                                 III.

11       Enter an order freezing the assets pending final judgment of defendants Bivona, Saddle River,

12 SRA Management, and Mazzola, and of relief defendants Michele Mazzola, Anne Bivona, SRA I,

13 SRA II, SRA III, Clear Sailing Group IV, Clear Sailing Group V, and Felix Investments in specified

14 assets or accounts obtained through the violations alleged herein.

15                                               IV.

16       Enter an order appointing an independent monitor for defendants Saddle River and SRA

17 Management, and for assets of relief defendants the SRA Funds, and Clear Sailing.

18                                             V.

19       Enter an order requiring defendants Bivona, Saddle River, and SRA Management to conduct a

20 verified accounting.

21                                             VI.

22       Enter an order enjoining defendant Mazzola from engaging in future violations of the SEC

23 Bar Order.

24                                         VII.

25       Enter an order permanently enjoining defendant Mazzola from engaging in future violations

26 of Section 203(f) of the Advisers Act [15 U.S.C. § 80b-3] and Section 15(b)(6)(B)(i) of the Exchange

27 Act [15 U.S.C. § 78o].

28

1

VIII.

2

Enter an order permanently enjoining defendants Bivona, Saddle River, and SRA

3

Management from engaging in future violations of Section 203(f) of the Advisers Act [15 U.S.C. §

4

80b-3].

5

IX.

6

Enter an order permanently enjoining defendants Bivona, Mazzola, Saddle River, and SRA

7

Management from engaging in future violations of Sections 5(a) and 5(c) of the Securities Act [15 U.

8

S. C. §§77e(a) and 77e(c)]

9

X.

10

Enter an order requiring defendants Bivona, Saddle River, SRA Management, Mazzola, and

11

relief defendants Michele Mazzola, Anne Bivona, SRA I, SRA II, SRA III, Clear Sailing Group IV,

12

Clear Sailing Group V, and Felix Investments to disgorge their ill-gotten gains according to proof,

13

plus prejudgment interest thereon.

14

XI.

15

Enter an order requiring defendants Bivona, Saddle River, SRA Management, and Mazzola to

16

pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)

17

of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209 of the Advisers Act [15 U.S.C. §80b-9].

18

XII.

19

Enter an order permitting expedited discovery.

20

XIII.

21

Enter an order prohibiting the movement, alteration, and destruction of books and records to

22

protect the books and records showing the location of assets and the disposition of investors' monies

23

and protect all remaining documents necessary for full discovery in this matter.

24

XIV.

25

Retain jurisdiction of this action in accordance with the principles of equity and the Federal

26

Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that

27

may be entered, or to entertain any suitable application or motion for additional relief within the

28

jurisdiction of this Court.

1

XV.

2       Grant such other and further relief as this Court may determine to be just, equitable, and

3 necessary.

4 Dated: March 21, 2016                     Respectfully submitted,

5

6                                MARC D. KATZ

7                                Attorney for Plaintiff
                               SECURITIES AND EXCHANGE

8                                COMMISSION

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28