UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

    v.

JOHN V. BIVONA, et al.,

        Defendants.

Case No. 16-cv-01386-EMC

**ORDER REGARDING PLAINTIFF SEC AND RECEIVER'S REQUEST FOR PRELIMINARY FINDINGS RELATED TO PROPOSED JOINT DISTRIBUTION PLAN**

Docket Nos. 196-197

Plaintiff SEC and the Receiver have jointly moved for approval of a proposed distribution plan involving the consolidation, liquidation, and distribution of the Receivership Assets to investors on a *pro rata* basis. *See* Docket Nos. 196, 197. By stipulation of the parties and this Court's order, the approval process has been bifurcated to assist the parties' discussions about potential distribution plans. *See* Docket No. 208.

At the first step of the approval process, the SEC and the Receiver request the Court make preliminary findings that (a) Defendants commingled investor funds; (b) Defendants diverted investor cash to themselves or otherwise violated provisions of the federal securities laws, and (c) Defendants' conduct would justify the termination of the management agreements and the exclusion of Defendants and certain specified insiders from recovery through the proposed distribution plan. *Id.* A hearing on the first step was held on August 30, 2017, at which the Court heard from the SEC and the Receiver, as well as two objectors to the request for preliminary findings. The first objector was third-party investor TeleSoft Capital LLC ("TeleSoft"), who objects to findings of commingling or diversion of funds with respect to its own investment. *See* Docket Nos. 210, 226. The second objection was filed by Defendants John Bivona and Saddle

River Advisors LLC, arguing that a finding of wrongdoing without trial would violate their due process rights, and by Relief Defendant Anne Bivona, arguing that she should not be barred from making a claim to recover the balance of a loan she made to Defendants because she has not been accused of wrongdoing. *See* Docket No. 212.

The second step of the approval process will address the merits of the SEC and Receiver's distribution plan itself, any objections thereto, as well as any alternative proposals filed by interested parties. The hearing on the second step is scheduled for September 28, 2017. Thus far, one alternative distribution plan has been filed by a group of investors with claims to 79% of the funds still invested. *See* Docket No. 229.

This order addresses only the first step of the process, the parties' request for preliminary findings and objections to those findings. However, because the requested findings will be material to the Court's analysis of the proposed distribution plans at the second step, the Court will first provide an overview of the current stage of proceedings and the legal framework governing the distribution of assets by a receiver in securities fraud cases.

## I.     BACKGROUND

The SEC filed this action alleging that Defendant John Bivona, his son-in-law Defendant Frank Mazzola, and affiliated Defendants Saddle River Advisors, LLC and SRA Management Associates, LLC raised approximately $53 million from investors. A number of Relief Defendants, including Mr. Bivona's spouse Anne Bivona, were also named.[1] Defendant Bivona allegedly commingled and diverted investor proceeds contrary to the promises he made to investors. Specifically, Defendants allegedly promised investors that their money would be used to buy shares in certain pre-IPO companies and to pay specified fees for their acquisition. Bivona, however, allegedly used the money to cover share purchase obligations to earlier investors in unrelated funds; attempted to disguise his conduct by transferring money in and out of multiple bank accounts; used $5.7 million of the funds to pay for personal and family expenses; and failed

---

[1] The other Relief Defendants are: SRA I LLC; SRA II LLC; SRA III LLC; Felix Investments LLC; Michele J. Mazzola (Frank Mazzola's spouse); Clear Sailing Group IV LLC, and Clear Sailing Group V LLC.

to provide investors with promised financial statements.

A.     Procedural History and Appointment of Receiver

On March 25, 2016, based on these allegations and supporting affidavits, the Court granted a temporary restraining order that, among other things, froze certain assets belonging to Defendants and Relief Defendants and appointing Michael A. Maidy as an Independent Monitor. *See* Docket No. 36.  In the order, the Court found that the SEC had presented "evidence establishing a prima facie case and a reasonable likelihood of prevailing on its claims that Defendants John V. Bivona, Saddle River Advisors, LLC, and SRA Management Associates have engaged in, are engaging in, are about to engage in, and will continue to engage in, unless restrained . . . transactions, acts, practices and courses of business that constitute violations" of various securities laws, and that Relief Defendants were "in possession of the proceeds of those violations and have been unjustly enriched by such receipt."  *Id.* at 1-2.

On May 3, 2016, all Defendants and Relief Defendants, except for Defendant Frank G. Mazzola and Relief Defendant Michele Mazzola, stipulated to granting the SEC's motion for preliminary injunction, which confirmed the terms of the earlier temporary restraining order. Docket No. 68.  On May 25, 2016, the Court granted the motion for preliminary injunction with respect to the Mazzolas "[f]or the same reasons the SEC was able to satisfy the requirements for a TRO."  Docket No. 96 at 4.

On October 11, 2016, the Court approved a stipulation between the SEC, Defendants John V. Bivona, Saddle River Advisors LLC, and SRA Management, LLC, and Relief Defendants SRA I LLC, SRA II LLC, SRA III LLC, Clear Sailing Group IV LLC, and Clear Sailing Group V LLC- that "the appointment of a receiver is appropriate."  Docket No. 142.  The Court found that "based on the record in these proceedings, the Independent Monitor's reports to the Court and the parties' Stipulation, the appointment of a receiver in this action is necessary and appropriate for the purposes of marshaling and preserving all assets of the Receivership Defendants [and certain other affiliated entities]."  *Id.* at 2.  Sherwood Partners was appointed Receiver.[2]  The Receiver was

---

[2]  The Receivership Defendants include Saddle River Advisor, LLC's holding companies (SRA I LLC, SRA II LLC, SRA III LLC (the "SRA Funds")) and Clear Sailing IV and Clear Sailing V

authorized to "transfer, compromise, or otherwise dispose of any Receivership Property, other than shares of pre-IPO companies, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such Receivership Property." *Id.* at 10.  The Order further provided that if a "liquidity event" occurred "for a particular Series of company shares, the Receiver may, subject to court approval, carry out a distribution of the proceeds of the liquidity event after making a reasonable effort to identify all investors in those shares." *Id.*  The Receiver was also authorized "subject to Court approval, [to] negotiate for the sale or transfer of shares of pre-IPO companies," and, with further Court approval "to sell, and transfer clear title to, the shares of the pre-IPO companies." *Id.*

Because the Receiver was appointed by stipulation, there was no need for the Court to make formal factual findings in appointing the Receiver.[3]  There is no dispute such appointment was appropriate.

Further, the parties have apparently reached a settlement resolving the underlying claims in this case.  *See* Docket No. 223. If the settlement is approved, then the administration of the receivership will be the last remaining issue to resolve.

B.      The Receiver's Investigations

Since its appointment as Receiver, Sherwood has investigated the assets of Defendants and Relief Defendants.  *See* Docket Nos. 168 and 183.  It has identified each investor in the Relief Defendant funds ("SRA Investors"), the amount of capital each investor asserts they invested in SRA, the amount actually invested, and the documentary support for those investments.  Hartheimer Decl. ¶ 4.  Both the Receiver and the SEC have also reviewed Defendant and Relief

---

(the "Clear Sailing Funds").

[3] *See, e.g.,* Fed. Prac. & Proc. § 2983 ("Factors that courts have considered relevant to establishing the requisite need for a receivership include the following: fraudulent conduct on the part of defendant; the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and, in more general terms, plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.").

Defendants' bank account and corporate records. Hartheimer Decl. ¶¶ 4, 19. The Receiver did not discover any creditors, but found other lawsuits against Defendants and Relief Defendants implicating the Receivership's assets, including at least one judgment. Hartheimer Decl. ¶¶ 16-17.

The Receiver's analysis of the Receivership Assets and Defendants' records is summarized below.

### 1. Unreliability of Records

The Receiver reports that Defendants' records are unreliable, making a thorough audit of the source of all investments impossible. Receiver's Mot. At 9 (citing Hartheimer Decl. ¶ 19). Defendants' accountant has described Defendants' operations as "willy nilly," claiming Defendants' records were prepared by an "unqualified bookkeeper" he "did not trust." Hartheimer Decl. ¶ 20. Due to the unreliability of the records, the Receiver claims that "any attempt to determine the source of the funds used by each Relief Defendant to make purported investments into the various pre-IPO companies . . . is not feasible." Receiver's Mot. at 9 (citing Hartheimer Decl. ¶ 19).

As an example of the unreliability of Defendants' records, the Receiver points to a shortfall of shares in the technology company Square, Inc. ("Square"). Investors in the Receivership Defendants appear to be entitled to more Square shares than are available for distribution, the shortfall apparently amounting to 9,799.72 shares with a present value estimated at $236,271. Nertea Decl. ¶ 3. The shortfall suggests that, prior to the appointment of the Receiver, there was an over-distribution of 16,808 shares to investors. Receiver's Mot. at 10. The Receiver has been unable to reconcile the disparity through conversations with Bivona or by reviewing Defendants' spreadsheets. Nertea Decl. ¶¶ 2-4. The objecting Investor Group contends that any shortage of Square shares is attributable to the Monitor's errors, not to any of Defendants' alleged misconduct, but that dispute was not addressed at the August 30, 2017 hearing and is not material to this order. *See* Docket No. 229 at 7.

As further evidence of the unreliability of records, the Receiver also points to a shortfall with respect to the pre-IPO shares of Palantir. Previously, the Monitor was unable to reconcile the number of Palantir shares allegedly purchased by SRA investors with the number of Palantir

shares reflected in Receivership Defendants' "Purchased Spreadsheet." *See* Docket No. 120 at 5-6. The SEC's most recent investigations suggest that the total shortfall for Palantir appears to be over 300,000 shares. The Receiver contends that the manner in which they uncovered this discrepancy offers further support for the unreliability of Defendants' records. Initially, Defendants' records suggested that they held an *excess* of 170,008 shares in Palantir, but a later investigation uncovered that TeleSoft had a claim to 227,000 shares of Palantir that was not reflected in Defendants' records. *See* Docket No. 74 at 11; Docket No. 120 at 5-6, Hartheimer Decl. ¶ 13. The SEC and the Receiver also learned that investor Global Generation Group LLC had made a $6.3 million investment with Defendants, $2.8 million of which was intended for 933,000 shares of Palantir. Global claimed the shares had never been delivered in kind or in cash value, and has already reduced that claim to a judgment. *See* Receiver's Mot. at 13; Hartheimer Decl. ¶¶ 16-17. The objecting Investor Group disputes whether there is a shortfall of Palantir shares based on their disagreement of how Global Generation Group's claim should be categorized, but that dispute will be addressed at the September 28, 2017 hearing. *See* Docket No. 229 at 13-15.

The Receiver maintains that these two examples highlight the unreliability of Defendants' records and the impossibility of successfully tracing all investor funds. Defendants and the objectors have not disputed the claim that Defendants' records are generally unreliable, however, the objecting Investor Group disputes whether the Palantir shortfall exists and whether the Square shortfall is attributable to Defendants or to the Monitor. *See* Docket No. 229. That dispute will be heard on September 28, 2017 and is immaterial to the issues decided in this order.

2. <u>Evidence of Commingling</u>

The SEC's investigation, as summarized in the declaration of Ellen Chen, *see* Docket No. 14, also identifies evidence that investor funds were regularly commingled, and that funds were regularly transferred between the various Defendant and Relief Defendant entities. Ms. Chen identified more than one instance in which Defendant SRA Management used investor funds from one Relief Defendant fund to cover share purchase commitments of pre-IPO companies obligated by other Relief Defendant funds, including shares in Palantir and other companies. Chen Decl.

¶¶ 36-43.  In many cases, one Relief Defendant's investments were funded by another Relief Defendant's funds.  *See* Chen Decl. ¶¶ 87-124.  Further, Defendant Bivona gave testimony before the SEC that sometime in 2012, after the SEC began its investigation into the Felix Multi Opportunity Funds ("FMOF"), he moved all the 13 funds to one bank account in his name.  Receiver's Mot. at 15.

Defendants do not object to a finding that funds were commingled, in the simple sense that common bank accounts were used or that shares were held in common pools.  At the hearing, Defendants' counsel simply argued that there should be no finding that the commingling was "nefarious" because the lending of money between the funds was purportedly permissible according to the governing documents of those entities.  To make a finding of illegality without a trial would violate their due process rights, they contend.  *See* Docket No. 212.  Thus, Defendants object only to any finding that such transactions between the funds were a form of wrongdoing or unlawful conduct.

Only TeleSoft objects to the SEC and Receiver's request for a finding of commingling.  TeleSoft does not challenge that Defendants may have generally engaged in commingling of funds, but argues that its investment (or, in the alternative, at least, $1,022,000 out of $1,475,500) was not commingled.  *See* Docket Nos. 210, 226.  Its objection is discussed below.

### 3.   Evidence of Diversion of Funds

The SEC also claims its investigation revealed evidence that Defendants regularly diverted investor funds.  For example, SRA funds were used to pay for law firms and attorneys for work unrelated to the SRA funds on more than one occasion.  Chen Decl. ¶¶ 27-30.  Similarly, expenses of one Relief Defendant were often paid with another's funds.  *Id.*  The SEC also claims Defendants expended $2,307,076 in management fees in excess of the amounts permitted by their respective governing documents.  *See* Chen Decl. ¶ 26.

The Receiver relied on these SEC findings and others to conclude that Defendants "may have misappropriated for personal expenses, up to $5.7 million for which there is inadequate documentation," excluding "amounts used for Ponzi-like payments to other investors or to fund the investments of other Relief Defendants."  *See* Docket No. 196 ("Receiver's Mot.") at 7.

As explained above, Defendants object to any finding that they diverted funds in an unlawful manner, arguing a finding of wrongdoing would violate their due process rights if made before trial. *See* Docket No. 212. As above, TeleSoft also objects to any finding that moneys from its investment were diverted, but it does not object to a finding with respect to other investors. *See* Docket Nos. 210, 226.

### 4. Exclusion of Defendants and Insiders

The SEC and the Receiver also ask the Court for a preliminary finding that the following entities and individuals, who it describes as Defendants, Relief Defendants, owners, or insiders, will be excluded from the recovery under its proposed plans.

- John V. Bivona - Defendant
- Frank Mazzola  - Defendant
- Anne Bivona  - Relief Defendant
- Michele Mazzola  - Relief Defendant
- David Jurist[4]  - Alleged Insider
- Alice Jurist  - Alleged Insider
- Former agents or employees of Saddle River Advisors, Felix Investments, FMOF Management, NYPA Management, SRA Management, Clear Sailing IV and Clear Sailing V and the Fortuna Fund Management  -  Alleged Insiders
- Other alleged insiders (including Emilio DiSanluciano[5])

*See* Proposed Plan of Distribution at 6-7 (Docket No. 196).

No Defendant or alleged insider has objected to the proposal to bar them from filing any claims against the Receivership Assets. Only Relief Defendant Anne Bivona objects, arguing there is no basis to bar her from making a claim for the balance of a $1.4 million loan she made to Defendants to complete the purchase of shares for investors. *See* Docket No. 212. Her objection is discussed in more detail below.

---

[4] David Jurist is allegedly an insider who received at least $75,000 from Clear Sailing Group IV. Ip Decl. ¶ 17.

[5] The SEC claims that "Mr. DiSanluciano actively participated in deceptive sales to investors such as Telesoft Ventures and received large commission payments from investor money, including the purchase and sale of Palantir shares in November 2011. Mr. Jurist was a manager of Clear Sailing and signed the checks for undisclosed payments in November 2011 using money taken from Global Generation and Progresso Ventures." SEC Reply at 4, n.3. He received at least $856,233 through an entity he owns called Thorsdale Inc. *See* Ip Decl. ¶ 17. He was also a manager of FB Management and FMOF II, two of the entities involved in the fraudulent scheme.

## II. **DISCUSSION**

A.   Legal Standard

The Court previously appointed the Receiver with Defendants' stipulation; no party objected to the appointment of the Receiver. *See* Docket No. 142. The question now before the Court is limited to how the Receiver should manage the assets under its control, including the manner of their distribution. The "primary purpose" of a receivership is "to promote orderly and efficient administration of the estate by the district court for the benefit of creditors." *SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986) (citation and quotation omitted). The district court's "power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad." *Id.* at 1037. The basis for that broad authority is that "most receiverships involve multiple parties and complex transactions." *Id.* As the Ninth Circuit has explained,

> [a] district judge supervising an equity receivership faces a myriad of complicated problems in dealing with the various parties and issues involved in administering the receivership. Reasonable administrative procedures, crafted to deal with the complex circumstances of each case, will be upheld. A district judge simply cannot effectively and successively supervise a receivership and protect the interests of its beneficiaries absent broad discretionary power. We would be remiss were we to interfere with a district court's supervision of an equity receivership absent a clear abuse of discretion.

*Id.* at 1038.

In exercising its equitable powers, the Court must ultimately determine how the Receivership's assets should be distributed to Defendants' investors and creditors. In reviewing a prospective plan, the Court must "satisf[y] itself that the distribution of proceeds . . . is fair and reasonable." *SEC v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991).

B.   Analysis

First, the Court will address the SEC and Receiver's request for preliminary findings that Defendants commingled and diverted investor funds or otherwise violated the securities laws, and Defendants John Bivona and Saddle River Advisor's LLC's objection that findings of wrongdoing without a trial would violate their due process rights. As explained below, in many securities

fraud cases, courts have adopted *pro rata* distribution plans based, in part, on their determination that tracing was not feasible because of commingling by defendants or other problems with record-keeping. Findings of wrongdoing are not necessary to the distribution of Receivership Assets (under whatever plan is ultimately adopted). First, Defendants do not challenge the Receiver's ability to distribute the assets. Moreover, the cases authorizing distribution focus on whether assets were pooled such that assets cannot accurately be traced or it is not feasible to distribute assets in an equitable manner. *See, e.g.*, *SEC v. Byers*, 637 F.Supp.2d 166, 179 (S.D.N.Y. 2009); *S.E.C. v. Sunwest Mgmt.*, 2009 U.S. Dist. LEXIS 93181, at *29 (D. Or. Oct. 2, 2009). Thus, the Court will not reach the issue of whether Defendants engaged in wrongful conduct at this time. The Court will instead limit its analysis to whether funds and stocks were pooled in common such that tracing will either be impossible or inequitable.

Second, the Court will turn to the SEC and Receiver's joint request to exclude Anne Bivona from making a claim against the Receivership. For the reasons explained below, whether Ms. Bivona should be excluded will depend upon the resolution of disputed facts. The Court will schedule an evidentiary hearing in connection therewith.

      1.    <u>Request for Findings of Commingling, Diversion of Funds, or Other Violations of the Securities Laws</u>

          a.    <u>Principles Governing Distribution of Receivership Assets</u>

A key threshold issue in determining the most equitable distribution plan will be whether the Receivership's Assets are adequate to satisfy the claims of all investors and creditors, an issue that is disputed by the objecting Investor Group but which will not be addressed until the September 28, 2017 hearing. The resolution of that dispute will likely play a significant role in fashioning the appropriate distribution plan here because the fundamental problem in many securities fraud cases arises when the assets available for distribution are insufficient to fully compensate all investors and creditors with legitimate claims. There are few hard-and-fast rules for how courts should exercise their equitable discretion in such circumstances, but one deeply engrained principle holds that where multiple people have been victimized, "all victims of the fraud be treated equally." *United States v. Real Property Located at 13328 and 13324 State*

*Highway 75 North*, 89 F.3d 551, 553 (9th Cir. 1996) (citation omitted). This principle traces its origin at least to *Cunningham v. Brown*, 265 U.S. 1, 13 (1924), the original Ponzi-scheme case in which the Supreme Court refused to permit creditors to trace their debts to recover from the remaining assets because doing so would come at the expense of similarly-situated victims. Instead, the Supreme Court held that the victims "were all of one class, actuated by the same purpose to save themselves from the effect of Ponzi's insolvency," and that, therefore, it was a case that "call[ed] strongly for the principle that equality is equity." *Id.*

If the available shares and/or funds are insufficient to fully compensate all investors, this principle has implications for how the Receivership Assets should be distributed to the victims in this case. In such a case, one possible distribution method would involve the apportionment of available assets on a *pro rata* basis to all investors, as advocated by the SEC and the Receiver. Another method would permit investors to "trace" their investment to a discrete portion of the remaining assets, and claim that amount. In situations involving mismanagement, poor record-keeping, or diversion of investor funds, it is often difficult if not impossible to successfully trace all claims. Indeed, that is the basis the SEC and the Receiver have cited here for to request a *pro rata* distribution. *See* Receiver's Mot. at 15 (arguing that "consolidation of the assets of the Relief Defendants is appropriate because there is no equitable means of allocating ownership among the Relief Defendants" and segregation of the assets "would result in similarly situated investors receiving unequal distributions"). If a particular investor who is able to "trace" his or her investment is permitted to do so, other victims will end up receiving a smaller portion of whatever remains. In effect, the investor who obtains relief based on tracing will obtain preferential treatment vis-à-vis other investors. The Eleventh Circuit has explained:

> To allow any individual to elevate his position over that of other investors similarly 'victimized' by asserting claims for restitution and/or reclamation of specific assets based upon equitable theories of relief such as fraud, misrepresentation, theft, etc. would create inequitable results, in that certain investors would recoup 100% of their investment while others would receive substantially less. . . . [I]n the context of this receivership the remedy of restitution to various investors seeking to trace and reclaim specific assets as originating with them is disallowed as an inappropriate equitable remedy.

*S.E.C. v. Elliott*, 953 F.2d 1560, 1569 (11th Cir. 1992).[6]  For that reason, courts generally "will not indulge in tracing when doing so would allow one fraud victim to recover all of his losses at the expense of other victims."  *U.S. v. Wilson*, 659 F.3d 947, 956 (9th Cir. 2011).  *See also Commodity Futures Trading Comm'n v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1115-16 (9th Cir. 1999) (affirming approval of pro rata distribution where assets were commingled); *Real Property*, 89 F.3d at 553 (affirming pro rata distribution as more equitable method despite traceability of some assets).

That rationale is bolstered by the fact that, typically, whether an investor is able to trace his or her funds is a matter of luck: for example, a defendant's records happen to be intact for that investor, or a defendant has not yet spent that investor's funds.  That mere fortuity, however, is not viewed an equitable basis to favor some claims over others, particularly where doing so would harm other investors.  *See Elliott*, 953 F.2d at 1569 (holding that "the equities weigh against allowing some to benefit from the fortuity that [defraudor] had not sold all of the securities" sought); *U.S. v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996) (affirming district court's refusal to trace funds on basis that it would permit some investors "to benefit merely because the defendants spent the other victims' funds first"); *SEC v. Byers*, 637 F.Supp.2d 166, 179 (S.D.N.Y. 2009) (finding that "it is merely a coincidence that [some] [f]unds were not commingled as extensively as [others] – and coincidence cannot be a basis to treat th[ose funds'] investors more favorably than the [other] investors"); *S.E.C. v. Credit Bancorp, Ltd.*, 194 F.R.D. 457, 463-64 (S.D.N.Y. 2000) (rejecting investor's attempt to compel return of unencumbered shares and full amount of dividend because "it is only a matter of chance . . . that [its] assets were not dissipated in lieu of those of its fellow customers").

To be sure, some courts have authorized tracing in circumstances where traceability was

---

[6]  *See also S.E.C. v. Path America, LLC*, No. C15-1350JLR, 2016 WL 1385144, at *2 (W.D. Wash. Apr. 6, 2016) (declining to permit investor to "jump ahead of all other investors and creditors with respect to any future distribution by the Receivership estate," since all had been "victimized by the fraud"); *SEC v. Capital Cove Bancorp LLC*, No. SACV 15-980-JLS (JCx), 2015 WL 9701154 at *11 (C.D. Cal. Oct. 13, 2015) (rejecting effort to trace property because "[a]llowing various investors to trace and reclaim specific assets" where many victims were involved and funds were commingled would be inequitable (quotation omitted)).

not simply a function of chance, but rather, due to true constraints on the defendant's control or use of the funds. *See, e.g.*, *Anderson v. Stephens*, 875 F.2d 76, 77-80 (4th Cir. 1989) (permitting return of funds deposited after district court had frozen entity's assets and entity had ceased doing business); *S.E.C. v. Black*, 163 F.3d 188, 196-97 (3d Cir. 1998) (affirming return of assets held in custodian accounts that were never pooled or under defrauder's control); *cf. City of Philadelphia v. Lieberman*, 112 F.2d 424, 426 (3d Cir. 1940) (ordering return of assets placed in actual trust account beyond insolvent entity's control). These situations appear to be limited to contexts where the assets sought were segregated or handled in a manner where the traceable proceeds were placed beyond the control of the defrauding entity. *See S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80, 90 (2d Cir. 2002) (recognizing that in some cases "the reason the assets were returned was not merely because they were traceable, but because the assets had been segregated in the manner of true trust accounts and/or had never been placed in the defrauder's control"); *Anderson*, 875 F.2d at 77-80 (deposit made after assets had been frozen).

Even where tracing is possible, courts retain the equitable discretion to employ other means of distribution of assets. *See, e.g.*, *Durham*, 86 F.3d at 71-73 (affirming district court's use of pro rata distribution despite traceability of assets and observing that "[n]o one can dispute that tracing would have been permissible under the circumstances"); *S.E.C. v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 331-32 (5th Cir. 2001) (affirming district court's use of pro rata method even where assets were indisputably segregated and observing that "[w]hile it may have been permissible in the present case for the district court to have allocated all of the segregated funds to the [objector]," the trial court was not "required to choose the equitable remedy requested by [the objector]").

These cases demonstrate that the feasibility of tracing and the presence of commingling, even if proven, do not require the court to adopt a particular distribution scheme. Rather, the Court must consider the situation as a whole, including how a particular plan might affect similarly situated victims, to determine the most equitable distribution method.

b.  Findings of Wrongdoing Are Not Required

Against that backdrop, the Court proceeds to review the SEC and Receiver's joint request

for findings that Defendants engaged in commingling and diversion of funds or other violations of the securities laws.  Defendants John Bivona and Saddle River Advisors have objected to the request, arguing that findings they violated the securities laws, diverted funds, or engaged in "nefarious" commingling of funds, aside from being unnecessary, would violate their due process rights if made before a trial.

Defendants' due process claim need not be resolved because, as explained below, the findings of wrongdoing requested by the SEC and Receiver are not required here.  The Court is not deciding *whether* to distribute the assets, but *how* to distribute them.  Had Defendants not consented to distribution of the assets, the Court would perhaps have been required to resolve the SEC's allegations of wrongdoing. *See, supra*, note 3.  Given Defendants do not dispute the propriety of a distribution, the Court need only decide what distribution method should be used here.  In doing so, the issue is not whether Defendants engaged in wrongdoing, but rather the fairness of the method itself to investors and creditors.  Although it is true that many of the cases discussing the *pro rata* method refer to commingling against the backdrop of a fraudulent scheme, the focus on commingling in these cases relates to determining whether investor monies can be meaningfully and fairly distinguished, not the legal culpability of the defendants.  For example, in *Byers*, the court approved a pro rata distribution.  In so doing, it rejected some investors' argument "that their money cannot have been commingled" because it "presumes" the remaining money was "'their' money" when, because of commingling, it "in all likelihood" included other investor money.  637 F.Supp.2d at 179.  Thus, the pertinent factor was not the defendants' wrongdoing, but rather the effect it had on the court's ability to distinguish what money belonged to which investor.  Similarly, in *Sunwest Management*, an objector argued that the distribution should be based on which property each investor had invested in.  The court overruled the objection in favor of consolidating all the investments made in all the different properties, because the evidence showed that "funds were taken from one property for use on another regardless of whether the funding property had positive or negative cash flow or value."  2009 U.S. Dist. LEXIS 93181, at *29.  This mingling of money meant that defendants had not treated the investments as segregated on a property-by-property basis, and thus it was not possible to assume that the money in a particular

14

property at any time actually came from the investors in that property.

Similarly, it is unnecessary to determine whether Defendants diverted funds in an unlawful manner. Many of the cited cases approving pro rata distributions did not involve diversion of funds. *See Byers*, 637 F.Supp.2d at 181-82 (approving pro rata distribution without discussion of whether diversion of funds for personal benefit occurred); *Sunwest Mgmt.*, 2009 U.S. Dist. LEXIS 93181 (same). It follows that a finding of diversion of funds is not a per se requirement to adopt a *pro rata* distribution method. That makes sense. What matters is whether there is a shortage of assets, not necessarily the reasons for the shortage. Whether a shortage results from unlawful conduct does not change the fact that there are insufficient funds to fully compensate all investors. And "when funds are limited, hard choices must be made." *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 84 (2d Cir. 2006) (quotation omitted). The court, sitting in equity, must thus determine how to distribute the remaining funds fairly. At this juncture, the reason for a purported shortfall of assets (*i.e.*, whether it was caused by Defendants' alleged diversion of funds or violation of the securities laws) does not appear to be material to the fairness analysis for the distribution method.[7]

Accordingly, the Court need not, and at this time will refrain from, making findings that Defendants violated the law or engaged in wrongful behavior. The Court will instead analyze allegations of commingling and the diversion of funds only to the extent those factors shed light on whether tracing is a feasible or equitable option in this case. The Court reiterates that another critical question is whether there is actually a shortfall of assets; that issue is not yet ripe for review, but rather, will be addressed at the September 28 hearing.

### c. Investor Funds Were Commingled

The Court first reviews the extent to which funds were commingled. The Court considers the extent to which funds were commingled in the plain sense; *i.e.*, "put together . . . into one

---

[7] Defendants have disclaimed any right to file claims with the Receiver. Thus, whether it would be permissible to enter such findings for the limited purpose of excluding Defendants from distributions by the Receiver is not before the Court. Only Relief Defendant Anne Bivona objects to her prospective exclusion; that issue is addressed below but it is irrelevant to the question here because Ms. Bivona has not been accused of unlawful conduct in the underlying case.

mass" or "mix[ed]." *See* Commingle, Black's Law Dictionary (10th ed. 2014). The purpose is to determine whether the source and destination of each investor's funds can be meaningfully disentangled.

There are no clear appellate or Supreme Court precedents setting forth whether a minimum threshold of commingling is required to conclude that it has occurred, let alone what that threshold should be. Several courts, however, have found that, under equitable principles, *any* commingling is sufficient. *See*, *e.g.*, *Sunwest Mgmt.*, 2009 U.S. Dist. LEXIS 93181 at *34 ("Due to the fungibility of money . . . courts have held that any commingling is enough to warrant treating all of the funds as tainted."); *Byers*, 637 F. Supp. 2d at 178 (finding "some evidence that commingling occurred" supported a pro rata distribution, and noting "the law does not appear to require more than that"). This principle flows from the fact that money is fungible and, once moneys are combined, disaggregation is somewhat arbitrary and disentanglement challenging. Thus, even the "presence of some tainted funds in [a] commingled account is sufficient to taint" legitimately-acquired funds in the context of money laundering. *United States v. Garcia*, 37 F.3d 1359, 1365-66 (9th Cir. 1994).

The SEC and the Receiver have introduced uncontroverted evidence that Defendants generally engaged in commingling of funds affecting the investors. For example, funds were regularly transferred between the Relief Defendants to cover share purchase commitments obligated by other Relief Defendants. *See* Chen Decl. ¶¶ 31-47, 87-124. Eventually, all the funds were combined into a single bank account. Receiver's Mot. at 15. Moreover, funds were regularly transferred in and out of the same small number of bank accounts, such that no investment was ever held in a separate or exclusive bank account. Chen Decl. ¶¶ 17-19. Defendants have conceded that they held funds and shares in common pools. Whether such mingling was wrongful or not, these undisputed facts are sufficient for the Court to conclude that investor moneys were substantially mixed together in the same bank accounts, complicating any attempt to trace investor funds to determine how each investor's money was ultimately used.

Further, the SEC and the Receiver have introduced uncontroverted evidence the shares Defendants purchased on behalf of their investors were pooled in common holding companies.

16

Here, it is helpful to consider how the investment structure operated. Defendants "marketed investments in early-to late-stage, pre-IPO technology companies, most of which are based in the San Francisco Bay Area." Compl. ¶ 2. This was accomplished through a variety of entities collectively referred to as "the SRA Funds" and including Relief Defendants SRA I LLC, SRA II LLC, and SRA III LLC. Each SRA fund "contain[s] several series, and each series purportedly contains shares, or an economic interest in shares, in one or more particular pre-IPO companies." Compl. ¶ 24. The investors' chief aim was "to make money on their investment from a 'liquidity event' at one of these pre-IPO companies—either through an acquisition of that company by another company or through the company's initial public offering." Compl. ¶ 27. Investors would receive a return if the "liquidity event caused the shares to be valued at more than what the SRA Funds paid for the pre-IPO interests, plus expenses." *Id.* The SRA Funds did not purchase the pre-IPO interests directly; rather, "[Defendant] Bivona purchased the pre-IPO interests on behalf of the SRA Funds through [Relief Defendant] Clear Sailing." Compl. ¶ 36. Clear Sailing then continued to hold title over them. Thus, the various entities included three types of companies. The "Investment Funds," including the SRA Funds, received investor money.[8] Ip Decl. ¶ II.1.A. The "Purchasing Funds," including Clear Sailing, purchased the shares or security interests for the investors.[9] Ip Decl. ¶ II.1.A. When shares were purchased, they were formally owned by the "Purchasing Funds," not by the "Investment Funds." Ip Decl. ¶ IV.1. The investors did not hold direct title to any of the shares; rather, they held an interest in the shares owned by the Purchasing Funds, including Clear Sailing. According to the Receiver, there is no document that "track[s] each investor's capital contribution and document[s] the specific shares that were purchased with those funds." Docket No. 74, Ex. A at 5. Defendants' records "provide no direct linkage between investor capital contributions and the purchase of specific shares." *Id.* at 6. Rather, the investors only held a security interest in the shares held by the various Purchasing Funds. *Id.* at 3-4.

---

[8] These include the Felix Multi-Opportunity Fund I, LLC; Felix Multi-Opportunity Fund II, LLC; NYPA Fund I LLC; NYPA Fund II LLC; SRA I LLC; SRA II LLCC; SRA III. Ip Decl. ¶ 1.A.

[9] These include Clear Sailing Group IV LLC, Clear Sailing Group V LLC, and Equity Acquisition Company, Ltd. Ip Decl. ¶ 1.A.

Accordingly, in addition to extensive commingling of *funds*, the *shares* purchased by Defendants were also pooled together, complicating any effort to meaningfully segregate or identify which shares were owned by which investor at any given time.

d.    TeleSoft's Investment Was Also Commingled

TeleSoft's objection does not alter the Court's conclusion.  In its objection, TeleSoft argues that at least $1,022,000 of its $1,475,500 capital investment can be tied directly to the purchase of Palantir stock, and therefore should be excluded from any finding of commingling or diversion of funds.  TeleSoft Obj. at 4 (Docket No. 210); Gibbs Decl. ¶ 20 (total TeleSoft investment); SEC's Mot. at 10; Chen Decl. ¶ 65 (Docket No. 14) (evidence of TeleSoft's $1,022,000 being wired from Clear Sailing bank account to seller of Palantir shares the same day as TeleSoft's deposit).  TeleSoft also argues that there is no evidence the remainder of its investment was commingled with other funds or diverted to Defendants.  As support, it points to its contractual agreement with Clear Sailing, which represented that TeleSoft would be the sole investor in a Series G, that the Series G would be used exclusively to invest in Palantir stock, and that the 227,000 Palantir shares promised to TeleShare would be held in the Series G.  Gibbs Decl. ¶¶ 1-4.

TeleSoft's objection falls short for a number of reasons.

First, TeleSoft's reliance on its contractual agreement with Defendants, under which it was purportedly the sole investor in the Series G, is insufficient to show that it was not similarly situated to other investors.  TeleSoft does not dispute that at all times, Defendants retained actual control of all of its investment funds and of all the Palantir shares in which TeleSoft purportedly held a security interest.  This case is unlike cases where courts have permitted tracing because the investor's assets were not within the defendant's control.  *S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80 (2d Cir. 2002) (observing that in such cases, "the reason the assets were returned was not merely because they were traceable, but because the assets had somehow been segregated *in the manner of true trust accounts* and/or had *never* been placed in the defrauder's control" (emphasis added)).  Rather, TeleSoft's money, and the shares in which it purportedly had a security interest, were maintained in virtually the same way as all other investors.  *See*, *e.g.*, *Byers*, 637 F.Supp.2d

18

at 180-181 (objecting investor was similarly situated to others because Defendants "exercised control over the [funds]" and used the funds "as part of one overarching scheme").  Indeed, Clear Sailing – not TeleSoft – held title to the actual shares in question, *see* Supp. Ip Decl., Ex. 4 (Docket No. 219-4) (stock certificate), just as it did for other investors, as explained above.  Further, these were not the first Palantir shares that Clear Sailing had purchased.  *See, e.g.*, Supp. Ip Decl. ¶ 7, Ex. 3; Supp. Ip Decl. ¶¶ 1-5, 7, Exs. 1, 4.  The vehicle by which TeleSoft's investment was accomplished is thus not meaningfully distinguishable from other investors, as explained above.

Second, even if TeleSoft *could* show that its funds were segregated or its shares were traceable and identifiable, that, standing alone, would not be a basis for excluding it from a *pro rata* distribution.  TeleSoft does not challenge the SEC's evidence that *other* investors' funds were commingled; TeleSoft appears to acknowledge that they were.  TeleSoft Obj. at 4 ("[W]hile the other fund investors may have invested in series that could potentially have commingled assets, TeleSoft did not.").  Accordingly, whether or not TeleSoft's funds were also commingled, the commingling of other funds would be a sufficient basis to reject tracing even for those investors who *were* able to trace their funds.  *See, e.g.*, *Sunwest Mgmt.*, 2009 U.S. Dist. LEXIS 93181 at *34 ("Due to the fungibility of money . . . courts have held that any commingling is enough to warrant treating all of the funds as tainted."); *Byers*, 637 F.Supp.2d at 178 (finding "some evidence that commingling occurred" supported a *pro rata* distribution, and noting "the law does not appear to require more than that").  *See also Commodity Futures Trading Comm'n v. Topworth Int'l, Ltd.*, 205 F.3d 1107 (9th Cir. 1999) (affirming *pro rata* distribution plan even though investor could demonstrate ending account balance with reliable records because others could not).  That is precisely the situation the Fifth Circuit confronted in *Durham* and *Forex Asset*, where it affirmed the district court's refusal to permit tracing even where undisputed evidence showed that the investments were either traceable or segregated.  *See Durham*, 86 F.3d at 73 (tracing not permitted where one investor could indisputably trace its $70,000 investment); *Forex Asset*, 242 F.3d at 331 (tracing not permitted where it was undisputed that $800,000 investment had been segregated (*i.e.*, not commingled)).

Third, TeleSoft has failed to demonstrate that its funds were in fact segregated. TeleSoft does not contest that the bank account into which it made its $1,475,500 investment was also used to hold money from other investors. Indeed, TeleSoft has not challenged the following:

- TeleSoft's capital contribution of $1,475,500 to Clear Sailing was wired to Clear Sailing's bank account ("CSGV-VNB-0952") on March 5, 2014. Prior to the deposit, the balance was $426. Chen Decl. ¶ 65. As that bank account was opened on January 1, 2013, it appears those funds were from other investors. Chen Decl. ¶ 17, Table 2. On the same day as TeleSoft's deposit, $1,022,000 was wired from that bank account to a seller of Palantir shares. *Id.* At the end of the day, the balance was $453,881. *Id.*

- In the following days, $230,000 was wired out of the account into accounts belonging to John Bivona (JBivona-VNB-0187) and Frank Mazzola (FMazzola-WFB-5073) for unknown reasons. Chen Decl. ¶¶ 66-68. John Bivona's account had held funds for other investors, including for investments in Pipio Associates and Twitter. Chen Decl. ¶ 53. Mazzola's account had also previously been used to hold money for Badgeville shares, *id.* ¶¶ 58 and 63, and for distributions to managers, *id.* ¶ 60.

- On March 21, 2014, two transfers of $200,000 were made into the CSGV-VNB-0952 account from Saddle River Advisors accounts, one of which had an unknown purpose and the other which was documented as "for purchase of stock." Chen Decl. ¶¶ 74-75. The same day, $75,000 was wired out to an account belonging to Frank Mazzola. Chen Decl. ¶ 76.

- On May 23, 2014, another $250,000 was transferred from Saddle River to the CSGV-VNB-0952 bank account; the same day, $100,000 was then wired from the CSGV-VNB-0952 account to purchase shares from a Square seller. Chen Decl. ¶ 115-116.

- On May 28, 2014, a Saddle River Advisors account transferred $100,000 to CSGV-VNB-0952; the same day, $250,000 was wired out of the account to purchase shares from Alibaba. Chen Decl. ¶¶ 118-119.

The SEC's evidence that money was transferred between that account and accounts owned by Defendants John Bivona and Frank Mazzola is uncontested. Similarly, it is uncontested that some of the money transferred into and out of the CSGV-VNB-0952 account was used to purchase shares in several other companies (including Square, Alibaba, Badgeville, Palantir, and Pipio Associates). Thus, contrary to TeleSoft's contentions, the money it gave to Clear Sailing was in fact mixed with money from other investors or from other bank accounts belonging to Defendants Bivona and Mazzola. This mixing of funds is a clear form of commingling.

Fourth, TeleSoft's argument that it can identify the shares of Palantir which it owns is also

meritless. The SEC presented uncontroverted evidence that Defendants told TeleSoft that the Palantir shares it had been assigned were represented by the stock certificate CSA-35; this certificate, however, was purchased *two years* before TeleSoft made the $1,475,500 investment with money from *other* investors intended for shares in Facebook and Twitter, *not* Palantir. Supp. Ip Decl. ¶ 7, Ex. 3; Supp. Ip Decl. ¶¶ 1-5, 7, Exs. 1, 4. The SEC also presented uncontroverted evidence that a portion of TeleSoft's money was actually used to purchase a different number of Palantir shares than TeleSoft had asked for, and represented by a different stock certificate, CSA-435. Supp. Ip. Decl. ¶¶ 6-7, Exs. 2, 3. Accordingly, the record shows that the shares TeleSoft purportedly received were purchased with money from other investors, and that TeleSoft's money was used to purchase shares for other investors. This demonstrates clearly that not only were TeleSoft's moneys and shares both commingled, but likely that its funds, along with other investors' funds, were used in a manner inconsistent with their original purpose. *Sunwest Mgmt.*, 2009 U.S. Dist. LEXIS 93181 at *28-29 (evidence that defendant "decided how and where to use funds on a 'who-needs-the-cash-now'" supporting finding of commingling and consolidated, *pro rata* distribution method).

In its supplemental objection, TeleSoft responds that it is not arguing it is entitled to 200,000 shares of Palantir because they are the same shares that were promised to it and represented by the CSA-35 certificate, but rather, because TeleSoft's investment funds can be tied directly to their purchase. TeleSoft Supp. Obj. at 6, n. 2 (Docket No. 226). This argument, however, is not an argument that no commingling occurred or that TeleSoft's investment was meaningfully segregated. Rather, it is a classic tracing argument. That TeleSoft is able to trace how its funds were misused, or what was ultimately purchased with them, is a matter of mere luck, given the state of Defendants' records. TeleSoft has presented no compelling reason why the Court should place it ahead of other investors by permitting it to trace its investment if the Court were to adopt a *pro rata* distribution method. *See Wilson*, 659 F.3d at 956 (investors who can trace their funds in a fraudulent scheme "do[] not necessarily move . . . ahead of all of the other victims"). The conclusion that tracing would unfairly benefit TeleSoft would be bolstered if, as alleged by the SEC, it is proven that by the time TeleSoft wired money to Defendants, Defendants

already had a shortfall of 678,527 shares of Palantir.[10]  Ip Decl. ¶¶ 18-21, Ex. 1; Supp Ip Decl. ¶ 7, Ex. 3.  If true, it would further undermine the notion that the shares purchased with its money were TeleSoft's in any meaningful sense, since it would tend to show that the shares purchased with TeleSoft's money were intended to cover shortfalls to other, earlier investors.

For these reasons, the Court overrules TeleSoft's objection.  It would be inequitable to permit TeleSoft to trace its investment at the expense of other investors.[11]

### 2.  Request to Exclude Relief Defendant Anne Bivona From Distribution Plan

The SEC and the Receiver have requested that Defendants, Relief Defendants, and other insiders be excluded from the distribution.  Only Relief Defendant Anne Bivona has objected, arguing that she has a legitimate claim to repayment of a $1.4 million loan she gave to Defendants to facilitate the purchase of shares.  The remaining Defendants have disclaimed any right to file a claim with the Receiver for any amount.  The Court **GRANTS** the request with respect to the non-objecting Defendants, Relief Defendants, and company insiders.

However, for the reasons below, the Court concludes an evidentiary hearing is required to determine whether Ms. Bivona should be excluded or otherwise treated differently from other claimants.  The Court begins with whether a bona fide loan exists, then proceeds to analyze whether exclusion or other differential treatment is warranted for Ms. Bivona's claim.

### a.  Whether Ms. Bivona's Loan Was Bona Fide

The SEC casts doubt on whether the loan Ms. Bivona gave and for which she intends to make a claim was bona fide.  Ms. Bivona purportedly gave a $1.4 million loan to Saddle River in late 2014 "to complete a purchase of shares for the funds and their investors."  Bivona Decl. ¶ 2;

---

[10]  As mentioned above, the objecting Investor Group challenges the notion that there is a shortfall of Palantir shares, a matter that will be reviewed at the September 28, 2017 hearing.

[11]  Global Generation Group/Benchmark have filed an objection to the proposed distribution plan, mostly for reasons that will be the subject of the September 28 hearing.  However, Global Generation claims that, "[i]f the Court were to consider an allocation of Palantir shares to individual investors, such as Telesoft, Global submits it is entitled to such an allocation.  Indeed, Global is prepared to present evidence that its purchase of Palantir shares is far more directly traceable than Telesoft's investment."  Docket No. 227 at 2.  Because the Court will not permit Telesoft to do so, it will not permit other investors who claim to have the ability to trace their funds either.

*see also* Bivona Response to RFP No. 3 at 4-5 (Bivona Decl., Ex. A).  The loan was given at a 6% per annum interest rate.  Docket No. 225 at AB000060.  Defendant SRA has repaid all but approximately $198,333 to Ms. Bivona with money from two of its bank accounts and an attorney escrow account belonging to Mr. Bivona.  Response to RFP No. 3 at 4-5 (Bivona Decl., Ex. A).  That the loan was evidenced by a note, interest was charged, and repayments were made are factors suggesting the loan was real.  *See Welch v. C.I.R.*, 204 F.3d 1228, 1230 (9th Cir. 2000) (identifying factors used to analyze bona fides of a loan agreement) (citation and quotation omitted).  Moreover, the loan was given at a 6% per annum interest rate, a far cry from the exorbitant 10% monthly interest rate loan which the court opted to treat as an investment rather than a loan in *Basic Energy*.  *See* 273 F.3d at 663.

The Court will assume that the loan was bona fide.  However, the SEC may attempt to present evidence to challenge the loan's bona fides at the evidentiary hearing.  Even if the loan is found to be bona fide, there may be grounds for excluding or discounting Ms. Bivona's claim for repayment.

> b.  Legal Authority to Exclude Claimants

The power to exclude persons from a distribution plan is within the scope of the "district court's decision relating to the choice of distribution plan for the receivership," *Quilling v. Trade Partners, Inc.*, 572 F.3d 293, 298 (6th Cir. 2009), and the court's exercise of its discretion "in a logical way to divide the money."  *SEC v. Basic Energy & Affiliated Res.*, 273 F.3d 657, 670 (6th Cir. 2001) (quoting *Forex Asset*, 242 F.3d at 670).  *See also S.E.C. v. Enter. Trust. Co.*, 559 F.3d 649, 652 (7th Cir. 2009) (district court has authority "to classify claims sensibly in receivership proceedings").  Thus, it is "in the district court's discretion to determine how and to whom the money will be distributed."  *S.E.C. v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997).

Other than references to broad principles of equity, however, the Court has not located case-law that sets forth a minimum threshold of misconduct that a person must have engaged in to justify his or her exclusion from a distribution plan.  The Court can discern at least two common situations justifying exclusion, however.

*First*, courts recognize that "[d]isqualifying those who took the business over the edge is

23

the most common feature, and the least contested aspect, of distribution plans." *SEC v. Enterprise Trust Co.*, 2008 U.S. Dist. LEXIS 79731 at *10 (N.D. Ill. Oct. 7, 2008). In *Enterprise Trust*, the receiver proposed excluding two business operators who "were the principals who induced clients to bring their accounts to [the business], prevented some from getting assets out of [it], engaged in speculative trading that lost millions, covered up their losses and violated the laws of Illinois and Nevada." *Id.* at *9-10. The court explained that "[t]here are no hard rules governing a district court's decisions in matters like these," and "[t]he standard is whether a distribution is equitable and fair in the eyes of a reasonable judge." *Id.* at *10. The court forbade the recovery because "the primary operators" of the fraudulent scheme had "violated state laws, gave false reports to clients, and performed other bad acts including the failure to cooperate meaningfully with the Receiver's investigation." *Id.* at *17. They were not "innocent victims." *Id.* The principle discerned from these facts is that it would be inequitable to permit a person whose active misconduct or unlawful activity resulted in harm to investors to recover through a distribution. *See also Byers*, 637 F.Supp.2d at 184 (proposal to "treat differently those involved in the fraudulent scheme when distributions are being made is eminently reasonable and is supported by case law"); *Basic Energy*, 273 F.3d at 660 (affirming distribution plan that excluded defendants accused of orchestrating Ponzi scheme).

    *Second*, courts have approved the exclusion of individuals who had claims recovery of which, by its very nature, would have resulted in the claimant profiting from the fraudulent scheme, even when the claimant did not knowingly engage in unlawful, wrongful, or criminal conduct. For example, in *Pension Fund*, the Eleventh Circuit affirmed the exclusion of a sales agent who "had put a great deal of effort into promoting and marketing [defendant's] products to investors" and who had "received at least $660,000 in commissions" based on his role. *See* 377 Fed.Appx. at 963. He had been "responsible for recruiting the investors who ultimately suffered losses due to the [company's] fraud." *Id.* Equity required denying the claim because "it would be inconsistent with the equitable distribution . . . to reduce the total potential recovery of the [victims] by compensating a former [sales agent] for commissions and/or wages earned in furtherance of the very fraudulent scheme that caused the losses at issue." *Id.* There was no

24

indication that the sales agent was aware of the fraud and he was not a party to the SEC enforcement action. *Id.* at 959. Thus, if the claim, by its very nature, involves a profit from the fraud earned, *e.g.*, through actively inducing others to join, equity may require exclusion.

Thus, the cases support, at the very least, complete exclusion of active wrongdoers as well as the exclusion of claims that involve a profit from the fraud.[12]

> c.   The Record Does Not Support Exclusion Under These Holdings

The undisputed facts in the record thus far do not establish that Ms. Bivona falls into either of the two categories discussed above. Although the SEC argues that Ms. Bivona's ownership alone justifies excluding her,[13] the SEC has not alleged that Ms. Bivona engaged in any active wrongdoing or unlawful conduct, or that in making the loan she profited from the fraud. To the contrary, the SEC thus far has only established that Ms. Bivona was a passive owner. Reply at 4 ("[I]t is undisputed that neither Anne Bivona nor Michele Mazzola worked for the businesses or made any business decisions.").

Accordingly, Ms. Bivona's ownership interest, standing alone, is not similar to the role played by excluded insiders or owners in *Byers*, *Enterprise Trust*, or *Pension Fund*, and is not, without active wrongdoing, a basis to exclude her.[14]

---

[12]  The Court does not suggest that these are the *only* two situations in which equity may justify complete exclusion. Applying general principles of equity might conceivably support exclusion in other circumstances, too, *see, e.g., Enterprise Trust Co.*, 2008 U.S. Dist. LEXIS 79731 at *10 (considering whether a claimant was an "innocent victim"); *Byers*, 637 F.Supp.2d at 184 n. 21 ("The Court also has the authority to consider the culpability of any investor seeking to recover under the Plan under the equitable doctrine of unclean hands."), but the SEC has yet to make a persuasive showing on any other ground.

[13]  Ms. Bivona held an ownership interest in SRA Management Associates. Anne Bivona's Answer, ¶ 38, Docket No. 112 ("Admit that in approximately 2013 Anne Bivona and Michele Mazzola became members of Saddle River Advisors."). It is unclear whether she was a full owner or a partial owner.

[14]  The SEC has also suggested that Ms. Bivona's "purported 'ownership' of the defendant entities appears to be nothing more than an attempt to shield some of their husbands' fraudulently obtained assets." Reply at 4. To the extent this is based on the suggestion that Ms. Bivona should not recover in the future because she previously received money she should not have received (whether because she was an owner or as repayments on her loan), the SEC's prospective settlement with her, requiring her to repay some amount, would resolve that issue. To the extent this is based on the suggestion that Ms. Bivona engaged in some form of active wrongdoing by

d.    <u>Awareness of Purpose of the Loan as Basis to Treat Claim Differently</u>

The SEC contends that Ms. Bivona either knew or was "willfully blind" to the fact that the loan would be used to perpetuate a fraudulent scheme.  The SEC has not cited a case where a claimant was excluded from recovery solely on the basis of their awareness of another's wrongdoing.  Nonetheless, even in the absence of total exclusion, the Court must examine whether Ms. Bivona's claim should be treated differently or discounted – should her claim be treated as repayment of a loan or as an investment subject to the distribution plan ordered by the Court?

Here, the Court considers *Basic Energy* to be instructive.  In *Basic Energy*, after SEC litigation had been initiated, a group of investors placed a sum of money in escrow on the defraudor's promise that, if the money could not be used to obtain a loan to make other investors whole within thirty days, the escrow amount would be returned to them.  273 F.3d at 661-62. When the receiver discovered the assets, they were seized and included in the consolidated distribution plan.  The escrow investors sought to have the money returned to them outside the distribution plan but the district court refused, opting to treat the purported loan as an investment primarily based on the high 10% monthly interest rate.  *Id.*  However, the court created an exception for any investors who could show that they were "completely and totally innocent and had no knowledge of the SEC's litigation against [the defraudor]."  *Id.* at 663. The Sixth Circuit affirmed.  Thus, in *Basic Energy*, the investors' awareness that they were offering a loan to a business subject to an SEC enforcement action was deemed as a factor that would justify de-prioritizing their claim vis-à-vis other creditors.

Under these principles, a person who is aware of the possibility of wrongful or fraudulent conduct may not be "completely and totally innocent."  *Id.* at 663.  Knowledge can affect their relief.  *See*, *e.g.*, *In re Tristar Esperanza Properties, LLC*, 488 B.R. 394, 402 (9th Cir. 2013) (explaining that "both creditors and investors 'accept the risk of enterprise failure'" but the risks "are based on different assumptions," because investors "expect to participate in the profits of the enterprise" whereas creditors do not).

---

willfully or intentionally "shield[ing]" her husband's wrongdoing, this rests on unproven and disputed state of mind issues discussed below.

In *Basic Energy*, the investors who knew of the pending SEC litigation (they also knew they were getting exorbitant interest) when they gave their "loan" were not excluded, but their claim was de-prioritized – they were treated like other investors for the balance of their loan, not as loan creditors. Hence, if Ms. Bivona knew that her husband's misconduct created a shortfall that required her loan to keep it afloat, for example, but gave the loan anyway, she might not be able to claim creditor status as a lender.

What equity requires will likely depend on the level of Ms. Bivona's awareness. Here, the SEC has suggested that Ms. Bivona was "willfully blind" to her husband's alleged wrongdoing. Traditionally, courts have treated "willful blindness" as equivalent to actual knowledge in the criminal context. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766, 769 (2011) (applying the doctrine of willful blindness to civil lawsuit for patent infringement). *Cf. U.S. v. Heredia*, 483 F.3d 913, 918, n.4 (9th Cir. 2007) (explaining that "deliberate ignorance, otherwise known as willful blindness, is categorically different from negligence or recklessness").

Ms. Bivona acknowledges she knew the loan would be used "to complete a purchase of shares for the funds and their investors," Bivona Decl. ¶ 2, but she expressly denies knowledge of any unlawful conduct. *Id.* ¶ 7. That she knew the loan would be used "to complete a purchase of shares for the funds and their investors" is not, standing alone, sufficient to conclude that she knew about the fraudulent scheme or, if she did, what level of culpability she had (willful blindness, recklessness, negligence).[15] Indeed, because the loan was used to purchase shares for investors who had sought such purchase, it is also plausible that the loan benefited, not harmed, those investors. On the other hand, the SEC contends she knew about her husband's wrongful conduct and diversion of funds.

Accordingly, an evidentiary hearing is required to determine Ms. Bivona's level of awareness about the fraudulent scheme when she made her loan.

### 3. Request to Terminate Management Agreements

The SEC and the Receiver initially requested that the Court find that Defendants'

---

[15] The SEC referred to deposition testimony Ms. Bivona had given, but that testimony has not been presented to the Court.

misconduct would justify terminating the management and advisory agreements with them and excluding them from receiving any associated management or advisory fees that may be due going forward. At the hearing, Defendants' counsel confirmed that Defendants would not file a claim to recover any management or advisory fees. Accordingly, the issue is moot and the Court need not resolve whether their conduct would have justified barring them from doing so.

Whether the agreements should be terminated, however, relates more closely to the type of distribution plan ultimately adopted by the Court. Accordingly, the Court will defer its decision until it has had the opportunity to consider the evidence and arguments of the parties and objectors regarding the proposed distribution plans. The Court advises, however, that if any of Defendants or other alleged insiders are proposed under any plan to manage any of the assets going forward, the Court will deem it necessary to examine their past conduct or role, if any, in the fraudulent scheme alleged in this case. The Court is unlikely to approve appointment of a manager implicated in prior misconduct. Thus, the parties and the objectors are advised that, if such persons are contemplated for management positions going forward, they should be prepared to present and argue whether entrusting such a person with management of the funds going forward would be fair, reasonable, or equitable.

## III.   CONCLUSION

The SEC and Receiver's request for preliminary findings is **GRANTED IN PART** and **DENIED IN PART**. For the reasons herein stated, the Court finds that Defendants commingled investor funds and shares, in that investor funds were held in common accounts and shares were held by common entities; investor funds thus generally are not segregable or traceable. The Court **OVERRULES** TeleSoft's objection to this finding. The Court **DECLINES** to make a finding at this time related to whether Defendants otherwise violated the securities laws, including whether the commingling was improper or whether they unlawfully diverted funds. Such a finding is not required to determine whether a *pro rata* distribution would be equitable.

The SEC and the Receiver's request to exclude non-objecting Defendants, Relief Defendants, and insiders from the recovery is **GRANTED**. However, the Court concludes that an evidentiary hearing is needed to resolve disputed factual issues regarding whether an equitable

basis exists to exclude Anne Bivona from recovering the balance of her loan (if bona fide) or otherwise treat the claim differently pursuant to a distribution plan. The parties must submit a proposal for the evidentiary hearing process by **September 26, 2017**.

Finally, the Court at this time reserves the issue of whether the management and advisory agreements should be terminated until it has reviewed the parties' proposed distribution plans. As noted above, however, the request to bar Defendants from recovering fees under those agreements is **GRANTED**.

**IT IS SO ORDERED**.

Dated: September 13, 2017

_____
EDWARD M. CHEN
United States District Judge