UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>JOHN V. BIVONA, et al.,<br><br>Defendant. | Case No. 16-cv-01386-EMC<br><br>**ORDER RE SEC'S MOTION FOR ORDER ESTABLISHING SHORTFALLS AND REQUEST FOR RECOGNITION OF CLAIM BY PROGRESSO VENTURES, LLC AND GLOBAL GENERATION GROUP LLC**<br><br>Docket No. 353 |

Before the Court are three requests for relief. First, the SEC requests an order establishing a shortfall in Palantir of at least 182,243 shares and at most 1,844,926, depending on how Global Generation and Progresso Ventures' claims are characterized and whether the Equity Acquisition Company (EAC) delivers certain shares to the Receivership. The SEC further advises the Court there may be shortfalls in other companies if the EAC does not deliver interests in those companies. The SRA Investor Group argues that it is premature to determine whether any share shortfall exists in light of the uncertainty about EAC.

Second and third, Global Generation Group LLC ("Global") and Progresso Ventures, LLC ("Progresso") both request that the Court classify them as creditors in the amount of money judgments they have already received, but allow them to recover as shareholders in Palantir should there be a liquidation event in which they would earn more than what can be recovered through their money judgments. The SEC is agnostic as to Progresso and Global's requests, but the SRA Investor Group argues they should be classified only as judgment creditors and that Progresso's claim amount should also be reduced.

For the reasons below, the Court concludes that Global cannot recover as *both* a creditor

*and* an investor and that Progresso may only recover as a creditor.  At this time, however, the Court does not decide how Global's claim will be classified or how Progresso's claim will be prioritized; these issues will be addressed in conjunction with the distribution plan and will be informed by the supplemental briefing ordered by the Court, *see* Docket No. 379.  Further, the Court concludes that there will be a share shortfall of at least 182,243 shares in Palantir, but that it is premature to assess the remaining shortfalls at this time.  Thus, the competing distribution plans should account for the possibility that there will be a share shortfall (of varying magnitude) and a cash shortfall (to satisfy outstanding monetary judgments and the claims of Square investors).

## I. **DISCUSSION**

A. Global Generation's Claim

There are two issues with Global's claim: first, whether it may be treated as a judgment creditor only or also as a claimant for shares; and, second, if it is treated as having a claim to shares, whether the SEC's calculation of 408,333 shares or Global's amount of 625,666 shares is correct.

1. Factual Background

Global and Benchmark Capital are Michigan limited liability companies for whom John Syron is the managing member.  In October 2011, Global Generation purchased 933,333 shares of Palantir through Defendants for a total of $2.8 million.  Defendants confirmed the purchase of 933,333 shares at $3 a share.  Separately, Global Generation invested approximately $3.2 million through Defendants in Facebook, Inc., for a price of approximately $30 a share.  Benchmark also invested $331,695.96 in Facebook on October 4, 2011.  Global Generation and Benchmark both entered into agreements with Defendants that they could "put back" some or all of the securities they purchased through Defendants, obliging Defendants to reimburse them the amount of their original investments.  These facts are uncontested.

In October 2012, Global and Benchmark both exercised their put back right on their Facebook shares because the value had dropped to $19 by the time the post-IPO lock-up period had expired, compared to the $30 per share at which they purchased them.  Though it took some time, Defendants ultimately reimbursed Global and Benchmark for the full amount of the

2

Facebook investments, approximately $3.2 million to Global Generation and $347,258.22 to Benchmark.

Also in October 2012, Global exercised its right to put back its Palantir shares (Benchmark never purchased shares in Palantir through Defendants) for reimbursement of the $2.8 million investment. Between October 2012 and October 2013, Defendants failed to reimburse Global that amount. In October 2013, Global sent a letter to Defendants noting the failure to pay and instead requesting that they "transfer control" of the Palantir shares to Global. Docket No. 198 (Syron Decl.) ¶¶ 10-11. That transfer did not occur, but Defendants began to make payments to Global Generation, ultimately reimbursing it for $923,000 out of its $2.8 million investment. Thus, as of November 2013, $1,877,000 remained unreimbursed.

In December 2013, Global sued Defendants for federal securities fraud, breach of contract, and state law tort claims in the Eastern District of Michigan. In that suit, Global sought only money damages; it did not seek relief in the form of Palantir shares. The claims went to arbitration, where Global obtained a final award (later confirmed in a judgment) for:

- $1,700,000
- Interest from Dec. 1, 2012 to Jun. 15, 2015 at 5.75% ($244,241.10)
- Interest for delayed repayment in respect of Palantir put of $59,012.33;
- Interest for delayed repayment in respect of Facebook put $104,179.17;
- Attorneys' fees of $66,624.43 and costs of $5,378.93
- Arbitration fees of $48,135.00

Supp. Syron Decl., Ex. 1-C. The judgment, for a total of $2,227,570.96, provides an award for money only, not injunctive relief for return of shares. Despite efforts to collect, Global has not yet been successful in recovering any amount of the judgment.

2. Discussion

Global proposes that it be treated as a creditor up to the amount of its judgment, but also as a shareholder if a Palantir liquidating event generates proceeds that exceed the amount of shares effectively distributed to Global.

All parties agree that the Court has "broad powers and wide discretion" to determine how

3

relief is distributed in an equity receivership. *S.E.C. v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 668 (6th Cir. 2001). In general, courts recognize that "all victims of the fraud [should] be treated equally." *United States v. Real Property Located at 13328 and 13324 State Highway 75 North*, 89 F.3d 551, 553 (9th Cir. 1996) (citation omitted). This principle is most often applied to reject the tracing of assets "when doing so would allow one fraud victim to recover all of his losses at the expense of other victims." *U.S. v. Wilson*, 659 F.3d 947, 956 (9th Cir. 2011). However, it does not mean that all claimants are always treated the same no matter the circumstances. To the contrary, the Court may treat claimants differently if it has a reasonable basis for doing so. *See S.E.C. v. Wang*, 944 F.2d 80, 85-87 (2d Cir. 1991) (approving distribution plan permitting different levels of recovery between stock and options traders "because of differences in the nature of losses borne by such traders as a result of defendants' misconduct" and because options traders "assumed great risk of loss"); *see also SEC v. Wealth Mgmt., LLC*, 628 F.3d 323, 333 (7th Cir. 2010) (explaining that "district courts supervising receiverships have the power to classify claims sensibly," including "the authority to subordinate the claims of certain investors to ensure equal treatment").

Global's main argument for hybrid treatment allowing for both money and shares is that it should not be penalized for acting to mitigate its losses by seeking to enforce its put rights in court. In other words, Global suggests that it will be unfairly penalized because it will lose the upside from a possible Palantir liquidation event.

This argument is not persuasive. Global's loss of the potential reward from increase in Palantir share value is a result of its own decisionmaking, not Defendants' conduct. Global opted to exercise its put right and in so doing abandoned the potential upside of an investment in Palantir shares. Global opted to sell its shares back to Defendants at the pre-determined price. Thereafter, Global sued Defendants and sought a money judgment—not restitution or delivery of shares.[1] Thus, at two steps, Global elected to abandon its potential investment in Palantir.

---

[1] The SEC's contention that a redemption is not completed or "settled" until payment is made, *see* SEC Mot. at 2, n.1, is inapposite because Global did not only invoke the put, but also sued to reduce its claim to judgment. No authority has been cited that a redemption remains incomplete even after a claim has been reduced to judgment.

4

Global's election situates it differently from other investors. The election of remedies doctrine "prevent[s] a party from obtaining double redress for a single wrong" and thus applies when "(1) two or more remedies . . . existed at the time of the election, (2) these remedies [are] repugnant and inconsistent with each other, and (3) the party to be bound . . . affirmatively chose[], or elected, between the available remedies." *Teutscher v. Woodson*, 835 F.3d 936, 955-56 (9th Cir. 2016) (holding that plaintiff alleging retaliatory discharge could choose either reinstatement or front pay, but not both for the same period of time) (citations and quotations omitted). Thus, faced with Defendants' breach, Global could have either sought to recover its shares or the amount of its original investment pursuant to the put. It could not have been awarded both. Having been awarded full monetary judgment, it is not entitled to Palantir shares as well; this would sanction double or overlapping recovery. The relief Global now seeks is barred by its election of remedy.

It is also barred by the merger doctrine. The merger doctrine provides that "[w]here the plaintiff brings an action against the defendant and a valid and final judgment for the payment of money is rendered in favor of the plaintiff, the original claim of the plaintiff is extinguished and a new cause of action on the judgment is substituted for it. In such a case the plaintiff's original claim is merged in the judgment." Restatement (First) of Judgments § 47 (1942); *see also Filice v. U.S.*, 271 F.2d 782, 783 (9th Cir. 1959) (explaining that "the common law doctrine is that the original cause of action becomes merged in the judgment, and all the plaintiff can thereafter do is to sue on the judgment"). Because Global has obtained a money judgment for its "claim" against Defendants, its original "claim" (whether for shares or money) has been extinguished, and all it can do now is recover on the money judgment. This does not "penalize" Global for attempting to mitigate the harm from Defendants' fraud and/or breach; the arbitration award includes damages plus attorneys' fees and costs, thereby making Global whole.

Finally, Global's claim is further barred by res judicata. Res judicata "bars litigation in a subsequent action of any claims that were raised or could have been raised in the prior action." *Owens v. Kaiser Foundation Health Plan*, 244 F.3d 708, 713 (9th Cir. 2001). To the extent Global sought only money but not shares or lost profit damages in its prior litigation, it cannot

now make an alternative claim for those remedies when it could have sought, but did not seek, in the first case.

Contrary to Global's assertion, application of those principles here does not result in inequitable treatment.[2] Instead, to allow Global to have its cake and eat it too would come at the expense of other shareholders. Unlike other "investors," Global would be afforded a full money judgment *plus* an equity interest; other shareholders would not have the security or advantage of a cognizable money judgment in addition to their claim to an equity interest in the shares.[3]

For these reasons, Global's claim is limited to either that of a creditor or an investor—not both. The question whether Global may still elect between the two remains open pending supplemental briefing and determination of a distribution plan.

3.      If Global is Treated as a Shareholder, the Amount is 625,666

Global also disputes the SEC's calculation of the number of shares to which it would be entitled were it not classified as a money judgment creditor. The SEC's analysis would assign 408,333 shares to Global, whereas Global contends the correct number is 625,666 shares. At the hearing, the SEC stated that it did not dispute Global's number. Thus, the material facts concerning the record are not in dispute. For the reasons below, the Court agrees that Global would be entitled to 625,666 shares, not 408,333.

The issue rests on whether certain undisputed payments made to Global and Benchmark are attributed to their investments in Palantir or in Facebook. In particular, the SEC relied on Defendants' ledgers which identify 11 payments to Global/Benchmark, six of which were made to Benchmark for a total of $347,259.00. *See* Docket No. 200, Exs. 5 (p. 56), 5-A (p. 57), 5-B (p. 58), 5-C (p. 59), -E (p. 61) and 5-F (p. 62). Global does not dispute that those payments were

---

[2] *Compare S.E.C. v. Capital Consultants, LLC*, 397 F.3d 733 (9th Cir. 2005) (refusing to apply common law "collateral source" rule to prevent offsets because the rule "would make for a more inequitable distribution of assets by recognizing more loss than the[] appellants actually suffered" and would not relieve tortfeasors of their conduct but rather "only affected the distribution of limited receivership funds . . . to the various innocent . . . clients").

[3] *Cf. Wealth Mgmt.*, 628 F.3d at 333 (explaining that district court in receivership distribution plan could apply the doctrine of equitable subordination to look at the substance of a claim rather than its form, and thereby could treat all shareholders alike, even if some had redeemed the shares and thus technically became unsecured creditors).

6

made, but argues that the ledgers inaccurately identify the payments as redemption for Benchmark's investments in Palantir. In fact, Benchmark never invested in Palantir—it invested only in Facebook. Supp. Syron Decl. ¶ 5. Thus, the ledgers are mistaken. The payments should have been allocated to Benchmark's investments in Facebook—not to Global's investments in Palantir.

Further, Global contends that the ledgers are inaccurate insofar as they claim that three payments to Global were made for redemption of Palantir. *See* Docket No. 200, Exs. 5 (56), 5-D (60), 5-F (62), and 5-G (63). According to Global, they were actually for redemption of Facebook shares because they were made in July 2013, whereas contemporaneous communications between Global and Defendants indicate that as of October 16, 2013, Global continued to maintain that no payments had been made to redeem Palantir shares. *See* Docket No. 198 (Syron Decl.) and Ex. 5 ¶¶ 10-11(Oct. 15, 2013 e-mail from Syron demanding the delivery of the Palantir shares). As Global argues, it took that position even before Ms. Ip's declaration misclassifying the payments was filed in June 2017 (Docket No. 200). *See also* Supp. Syron Decl. ¶ 1. There does not appear to have been an incentive at the time to misrepresent the payments received from Defendants and there is no evidence that Defendants disagreed with Syron's claims of non-payment regarding Palantir. No party has introduced evidence to challenge Global's assertion or the reliability of its evidence.

Ultimately, this dispute means that Global has been reimbursed for $923,000 of its $2.8 million investment in Palantir, leaving a total of 625,666 unredeemed Palantir shares at the price of $3/share, rather than 408,333 shares as calculated by Ms. Ip for the SEC. Because the evidence supports Global's position and no party has challenged or introduced contrary evidence,[4] if this issue were relevant, the Court would adopt Global's position regarding the number of shares (if it is treated as an investor).

---

[4] In passing, the SRA Investor Group says that Global's claim is "inconsistent" with the Receiver's records, but that merely cites back to Defendants' mistaken classification of the payments. *See* SRA Br. at 6, n.7.

7

B. Progresso Ventures is a Money Creditor, Not an Investor Claimant

Progresso Ventures also seeks hybrid treatment as a creditor up to the amount of its money judgment *and* a shareholding investor for any profits above that amount resulting from a Palantir liquidation event. Progresso's argument for shareholder treatment is in some ways weaker than Global's. Progresso, unlike Global, *never* invested in *any* shares or securities. Rather, it gave FB Management (not a defendant or receivership entity) a *loan* guaranteed by Defendants Bivona and Mazzola so that they could purchase shares in Facebook. FB Management defaulted on the loan, allegedly because the money was diverted to purchase shares in Palantir for other persons (after being funneled by Bivona/Mazzola from FB Management to Clear Sailing through FMOF II). Progresso thereafter brought suit on the note to recover the unpaid principal and interest. It has never brought suit to seek the disgorgement-type remedy for recovery of Palantir shares it asserts now against Clear Sailing.

The questions before the Court are whether Progresso should be treated only as a money judgment creditor or whether Progresso also has a claim to the Palantir investment made with the diverted funds. Also, the SRA Investor Group argues that if Progresso is treated as a creditor, the amount of its judgment should be reduced.

1. Factual Background

Eduardo Saverin, one of the co-founders of Facebook, lent FB Management Associates, LLC (one of the Mazzola entities) $4 million to purchase pre-IPO shares of Facebook. Pritzker Decl., Ex. A at ¶¶ 1-3. Saverin formed Progresso Ventures LLC and thereafter assigned it his interest in the loan. The loan amount was subject to a 15% annual, compound interest rate. If a Facebook IPO was successful, Progresso would be entitled to a portion of the profits over and above the loan amount. *Id.* at ¶¶ 7, 9. The Note was to mature within 30 days of a Facebook liquidity event but no later than February, 16, 2014. *Id.* ¶ 8. The liquidity events occurred in June and July of 2011. *Id.* ¶ 5. In April 2012, Progresso informed FB Management that the loan was due, at that time in the amount of $4,479,689, including principal, interest, and a portion of the profits earned over the loan amount. Pritzker Decl., Ex. B ¶ 20. Between May and July 2012, FB Management repaid $2,939,008, leaving an unpaid balance of about $1.5 million. Pritzker Decl.,

8

Ex. A ¶ 11. That money was apparently diverted from FB Management to FMOF II to Clear Sailing to purchase Palantir shares for other investors, without Progresso's knowledge or permission.

Three years later, in July 2015, Progresso sued FB Management in New York state court. Because of the 15% interest rate, the amount due at that time had grown from $1.5 million to $3.76 million. *Id.* ¶ 1. Progresso sought only the recovery of this amount; it did not seek any shares in Palantir or disgorgement of profits earned by Defendants. *Id.*

In opposing Progresso's lawsuit, FB Management claimed it had entered into an oral agreement with Progresso/Saverin in November 2011 to invest the remaining balance in Palantir shares. *See* Docket No. 360-5 at ¶ 11. Progresso denied that representation. Pritzker Decl., Ex. C at ¶¶ 5-7 (Saverin declaration in NY action stating that "I never asked Mr. Mazzola or anyone else affiliated with FB Management or Felix Investments LLC to reinvest the proceeds of the Note into any other fund, including a fund related to Palantir," "[n]or did I ever agree to any such investment") and Ex. D at pp. 4-8 (arguing there had been no oral modification to the loan agreement); *see also* Docket No. 199 (Saverin Decl.) ¶ 4 ("I have never authorized the reinvestment of the Note proceeds in Palantir shares or any other investment.").

In October 2016, the New York court entered summary judgment for Progresso against FB Management based on the terms of the Note, awarding a total of $5,529,364.25 based on $3,171,508.93 in outstanding principal, $392,311.31 in accrued interest, $363,374.96 as additional returns, $1,544,147.10 in legal fees, and $58,021.95 in disbursements. *See* Docket No. 360-2. The judgment does not award Progresso disgorgement of profits or the delivery of any shares. Progresso never sought such a remedy; nor did it *seek* to join Clear Sailing as a party.

2. Progresso's Investor Claim

As noted above, the SEC's investigation shows that Progresso's loan monies were diverted from FB Management to FMOF II to Clear Sailing, and that Clear Sailing thereafter used the money to purchase 3.1 million shares in Palantir for other investors unrelated to Progresso. *See* Docket No. 200 (Ip Decl.) at ¶ 17. Progresso argues that it never requested or authorized the use of its money to make that purchase. This evidence is uncontested.

9

Progresso contends that, in light of the diversion of its moneys, it has a restitution claim for disgorgement against Clear Sailing distinct from the breach of loan agreement and guaranty causes of action it maintained against FB Management, Bivona, and Mazzola. The SRA Investor Group, however, argues that Progresso, like Global, is precluded from pursuing that claim based on the doctrines of merger, res judicata, and election of remedies.

It is questionable whether Progresso's claim herein for disgorgement is barred by merger, res judicata, and election of remedies. FB Management and Clear Sailing are distinct entities and the SRA Investor Group has not demonstrated privity between the two. *See Watts v. Swiss Bank Corp.*, 27 N.Y.2d 270, 275 (1970) ("The burden of proof in establishing the conclusive effect in the rendering jurisdiction of a prior judgment is upon the party asserting it."). Although FB Management was controlled by Bivona and Mazzola (in addition to insider Emilio DiSanluciano), and Bivona controlled Clear Sailing, *see* Compl. ¶¶ 20, 37, that fact alone may not be sufficient to demonstrate privity. *See Blue Sky, LLC v. Jerry's Self Storage, LLC*, 44 N.Y.S.3d 173, 176 (2016) (where debtors re-loaned money to third-party entity in which they held an 80% stake, the plaintiff creditor who had previously sued debtors was not precluded from bringing subsequent, separate suit against third-parties because privity was not shown). "[P]rivity does not have a single well-defined meaning" but is rather "an amorphous concept [which] includes those who are successors to a property interest, those who control an action although not formal parties to it, those whose interests are represented by a party to the action, and those who are coparties to a prior action." *Buechel v. Bain*, 97 N.Y.2d 295, 304 (2001) (quotations, citations, and alterations omitted). The SRA Investor Group has not demonstrated that Clear Sailing is a successor in interest to FB Management; that Clear Sailing controlled the legal defense in Progresso's prior litigation against FB Management; that FB Management or Bivona/Mazzola represented Clear Sailing's distinct interests in the prior litigation; or that Clear Sailing was a co-party.

Furthermore, the causes of action against FB Management and Clear Sailing appear to have arisen at different times and out of different facts: the loan agreement was breached as soon as repayment was not made, but potential claims related to the diversion and mis-use of funds accrued at a different point in time and were in some ways independent of FB Management's

10

breach. Facts establishing the breach by FB Management are not identical to those establishing diversion by Clear Sailing. For res judicata purposes, the claims arguably do not "spring from the same 'transaction' or 'claim.'" *Paramount Pictures Corp. v. Allianz Risk Transfer AG*, 31 N.Y.3d 64, 78 (2018) (explaining that courts look to "whether the underlying facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage" (quotations and citations omitted)).

Nonetheless, Progresso's present claim for relief is problematic. In effect, Progresso seeks non-restitutionary disgorgement against a third party with whom it did not transact.

Progresso, to support its claim, relies on *Nickel v. Bank of Am. Nat. Trust & Sav. Ass'n*, 290 F.3d 1134 (9th Cir. 2002), which states that "[t]he elementary rule of restitution is that if you take my money and make money with it, your profit belongs to me," *id.* at 1138. However, *Nickel* involved a claim for breach of a trustee's fiduciary duty brought directly against the trustee who owed the duty. The principle of non-restitutionary disgorgement is applied as a matter of course on a claim for breach of fiduciary duty. *See Nickel*, 290 F.3d at 1138 (citing Restatement (First) of Restitution § 1 (1937) ("[W]here a person in a fiduciary relation to another makes a profit in connection with transactions conducted by him as fiduciary, he is ordinarily accountable to his beneficiary for the profit, although the beneficiary suffered no loss[.]")). *Nickel* does not discuss whether a similar remedy is available in a claim for tortious interference with contract, the theory Progresso asserts against Defendants here. Such a claim, disgorgement of profits "will not be afforded when the plaintiff's remedies at law are adequate to redress his or her injury." *Ramona Manor Convalescent Hosp. v. Care Enter.*, 177 Cal.App.3d 1120, 1140 (1986) (jury award to plaintiff which included lost profits damages under interference with contract tort in addition to disgorgement of defendant's profits under unjust enrichment was erroneous because "an action for unjust enrichment is inappropriate [when the plaintiff] can obtain full redress for its lost profits under its action for [intentional interference with contract]").[5] Progresso's money judgment is an

---

[5] Although *Ramona* is a California case, it applied the Restatement of Restitution, which is also relied upon by New York courts. *See Paramount Film Distributing Corp. v. State*, 30 N.Y.2d 415,

11

adequate remedy at law.  Moreover, even as against FB Management, it does not appear that Progresso would have been entitled to disgorgement of profits based on the breach of the loan agreement itself.  *See* § 22:2 28A N.Y. Prac., Contract Law § 22:2 ("Disgorgement is usually not a remedy for breach of contract because disgorgement sets damages in light of defendant's gains, as opposed to the loss to plaintiff resulting from the breach.").  *See U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 696 (2d Cir. 1991) (holding that trial court did not err by awarding damages based on plaintiff's actual damages rather than defendant's profits from breach of contract because, unless "the defendant's profits . . . tend to define the plaintiff's loss," such an award "would tend to be punitive, and punitive awards are not part of the law of contract damages").

In any event, *Nickel* does not recognize a non-restitutionary disgorgement remedy brought against a third-party other than the original tortfeasor.  Here, Progresso seeks to recover the profits that were made by Clear Sailing, who ultimately received the monies Progresso loaned to FB Management LLC after Bivona transferred the funds through FMOF II.  Progresso has not cited any cases holding that a non-restitutionary disgorgement remedy (as opposed to damages) can be pursued from a third party with whom the plaintiff had no dealing.  *Cf. Nickel*, 290 F.3d at 1138 (disgorgement permitted directly against tortfeasor); *Aguayo v. U.S. Bank*, 200 F.Supp.3d 1075 (S.D. Cal. 2016) (same).  Although that circumstance was present in one cited case, the issue was not discussed or analyzed by the court.  *See SEC v. Wencke*, 783 F.2d 829 (9th Cir. 1989) (rejecting due process challenge by a shareholder in Ramapo Corporation to a disgorgement order requiring Portsmouth Square, Inc. ("PSI") to disgorge its shares in Ramapo which it purchased with money diverted by defendant Wencke (who controlled PSI) from other companies he controlled).

Even assuming that Progresso could in theory have stated a valid claim for disgorgement of profits against Clear Sailing, the equities do not weigh in favor of affording that remedy here.  The alleged wrongdoers according to Progresso are, at best, FB Management, Bivona/Mazzola,

---

421 (1972); *Alan B. Greenfield, M.D., P.C. v. Long Beach Imaging Holdings, LLC*, 981 N.Y.S.2d 135, 137 (2014).

FMOF II, and Clear Sailing. Those alleged wrongdoers do not stand to gain if Progresso's disgorgement claim is denied. The purpose of the remedy of non-restitutionary disgorgement to deprive to the wrongdoer of unjust gain would not be fulfilled here. Rather, recognition of the claim would, at this point, "only affect[] the distribution of limited receivership funds . . . to the various innocent [investors]." *Capital Consultants*, 397 F.3d at 743. It "would make for a more inequitable distribution of assets by recognizing more loss than [Progresso] actually suffered" rather than relieve the wrongdoers of punishment for their conduct. *Id.* at 738. Thus, in the context of this receivership, equitable principles suggest that Progresso's recovery from the innocent victims should not exceed the amount of its loss (*e.g.*, either the amount of money owed on its note and diverted to Clear Sailing or the amount of its money judgment), but not to profits earned from the use of its money.[6]

For these reasons, the Court will not allow Progresso to maintain an investor claim. Progresso is limited to recovery on its money judgment as a creditor.

### 3. Reduction of Progresso's Money Judgment

Separately, the SRA Investor Group argues that Progresso's money judgment for $4.5 million should be reduced to a more "reasonable" amount. The basis for the SRA Investors' argument is that Progresso's unpaid principal was only $1.5 million which has compounded to $5.5 million over time by virtue of the 15% interest rate, $1.6 million in attorneys' fees, and other costs. SRA challenges the reasonableness of the attorneys' fee award, comparing the $1.6 million awarded to Progresso's lawyers with the $66,000 awarded to Global's lawyers.

The Court is bound to recognize the New York state court's judgment.[7] However, it is

---

[6] *See* Restatement (Third) of Restitution and Unjust Enrichment § 41 (2011) ("[T]he enrichment of innocent recipients of misappropriated financial assets—a class essentially limited to third-party donees from the wrongdoer—will normally be measured by the amount received, including interest and proceeds, *but without liability for consequential gains*. [T]he consequential gains for which the conscious wrongdoer is liable (and the innocent recipient is not) are usually derived from a profitable subsequent investment of misappropriated funds." (emphasis added)).

[7] *See* 28 U.S.C. § 1278 (holding that the records and judicial proceedings of any state court "shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken"); *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 250 (9th Cir. 1999) ("The preclusive effect accorded a state court judgment in a subsequent federal court proceeding is determined by

13

unclear whether the Court has equitable authority either to reduce the amount of the claim or to alter its priority, either in whole or in part, vis-à-vis other investors or creditors. This issue remains open subject to supplemental briefing and consideration of the proposed distribution plans.

C. The SEC's Request for a Finding of Shortfall

Having determined how Progresso and Global's claims should be classified, the Court reviews the SEC's request for a finding of shortfall.

1. Palantir Shortfall

Based on Ms. Ip's updated analysis—which no party contests—Clear Sailing currently has 5,422,600 Palantir shares available for distribution. Ip. Supp. Decl. ¶ 5 and Ex. 2-A at 1. If EAC delivers the shares owed to Clear Sailing, then there will be 5,740,249 shares available for distribution. *Id.* ¶ 6 and Ex. 2-A at 2.

The disagreement arises with respect to how many Palantir shares are owed to investors. Treating Global Generation as an investor with a claim to 408,333 shares, Ms. Ip counts an obligation of 6,330,825 Palantir shares. *Id.* ¶ 3. Thus, Ms. Ip calculates a 590,576 share shortfall (including Global's claim) which could rise to 908,225 if EAC fails to deliver the shares. *Id.* ¶¶ 2, 7, 10. This does not include Progresso's claim, which Ms. Ip calculates could be 503,558 if its $1,510,672.50 interest is allocated to the purchase of $3.00 per share, or 719,368 at $2.10 per share. *Id.*¶¶ 8-10. Progresso argues for a $2.10 share price because that is the price at which Defendants in fact purchased the stock. *See* Docket No. 197 at 5-6.

In light of the Court's holding that Progresso's claim will be limited to recovery of its money judgment, Progresso's claim to shares will not be considered in calculating the Palantir shortfall. However, the question whether Global may choose between creditor or investor status remains open subject to supplemental briefing. If Global is permitted to make an election, then, as

---

reference to the laws of the rendering state."); *Fiore v. Oakwood Plaza Shopping Ctr., Inc.*, 78 N.Y.2d 572, 577 (1991) ("[R]eview by the courts of this State is limited to determining whether the rendering court had jurisdiction, an inquiry which includes due process considerations. Thus, inquiry into the merits of the underlying dispute is foreclosed; the facts have bearing only in the limited context of our jurisdictional review.").

14

explained above, the Court will credit it with a claim to 625,666 shares. With these assumptions in mind, the evidence indicates that the Palantir shortfall will depend on whether Global is treated as an investor or creditor and on whether EAC delivers on the obligated shares, as charted:

|  | EAC Delivers 317,649 | EAC Does Not Deliver |
|---|---|---|
| **Global (Creditor Only)** | 182,243 | 499,892 |
| **Global (Investor With 625,666)** | 807,909 | 1,125,558 |

It is premature to determine the exact shortfall with certainty because the dispute with EAC remains outstanding and Global's treatment will depend on the supplemental briefing. As stated at the hearing, the parties' proposed distribution plans should therefore take these contingencies into consideration.

2. Shortfalls in Other Companies

The SEC points to two other shortfalls.

First, the SEC says that there will be a shortfall with respect to Square, Inc. investors because, when the receivership began, 97,000 shares had not yet been distributed to investors; the Receiver subsequently sold them but the amounts were not given to investors. An unspecified amount of those proceeds have gone to pay the receiver's expenses (with Court approval). As a result, the receiver cannot distribute Square shares to investors without re-purchasing them. It is unclear at this time how much money is owed to Square investors. No party disputes that there will be a shortfall however. The parties' distribution plans therefore should account for this shortfall.

Second, the SEC says that there could be a shortfall if EAC does not deliver shares owed to the Receivership in 5 companies, as shown below. Chen Decl. ¶ 7. In the table below, the Court juxtaposes that information with the Receiver's report regarding the number of valid claims received per company. *See* Docket No. 340-1, Ex. A.

15

| Company | Potential Shortfall if EAC Does Not Deliver | Total Valid Claims |
|---|---|---|
| Uber | 500 | 500 |
| Airbnb | 11,125 | 11,125 |
| Pinterest | 69,614 | 39,597 |
| Lyft | 9,479 | 9,479 |
| Practice Fusion | 545,094 | 1,462,273 |

No party disputes the number of shares owed by EAC. Based on the unresolved nature of the dispute with EAC, it is premature to determine at this time whether a shortfall exists. It appears, however, that the potential Pinterest shortfall has been overstated in light of the small number of claims made. Further, the Practice Fusion shares are reportedly nearly worthless, retaining a value of $0.014 per share or a total value of approximately $7,631.32 to investors. The parties' proposed distribution plans should account for these contingencies as well as the possibility of a surplus in Pinterest shares. As discussed at the hearing, the Receiver shall provide an update about the status of the dispute with EAC before the next case management conference. Finally, there are outstanding money judgments. If shares need to be liquidated to come up with cash to pay judgment creditors, there will be an additional shortfall of shares.

///
///
///
///
///
///

## II. CONCLUSION

For the reasons explained above, the Court holds that: (1) Progresso may recover only as a money judgment creditor; (2) Global may not recover as both a creditor and an investor—the precise treatment of its claim remains an open question pending supplemental briefing; (3) if Global is treated as an investor, the correct allocation is 625,666 shares; and (4) the SEC has demonstrated a shortfall in Palantir shares between 182,243 and 1,125,558, depending on whether EAC delivers shares owed and how Global is classified. The remaining issues remain open pending supplemental briefing, proposal of distribution plans, and resolution of the dispute with EAC.

This order disposes of Docket Nos. 353, 359, and 360.

**IT IS SO ORDERED**.

Dated: July 30, 2018

_____
EDWARD M. CHEN
United States District Judge