UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>FELIX INVESTMENTS, LLC,<br><br>Defendant. | Case No. 16-cv-01386-EMC<br><br>**ORDER RE PROPOSED DISTRIBUTION PLANS**<br><br>Docket Nos. 407, 420 |

After unsuccessful efforts to come to an agreement regarding a plan of distribution of the receivership assets, the parties have submitted two competing plans for the Court's consideration. One is the plan proposed by the Securities and Exchange Commission ("SEC") and the Receiver. *See* Docket No. 420 ("Joint Plan"). The other is the plan proposed by the SRA Funds Investor Group ("Investor Group"). *See* Docket No. 407 ("Investor Plan"). The Court has reviewed the arguments, recommendations, and objections made by all the interested parties during the course of extensive briefing and two hearings and hereby adopts, for the reasons discussed below, a distribution plan that incorporates elements of both the Joint Plan and the Investor Plan.

## I. FACTUAL AND PROCEDURAL BACKGROUND

A. Procedural Background

In June 2017, the SEC and the Receiver filed their original proposed joint distribution plan, which called for the pre-IPO liquidation of securities held by the SRA Funds and a subsequent *pro rata* distribution in cash to investors and creditors. *See* Docket No. 196 at 7. Several parties opposed the plan, and the Investor Group proposed an alternative distribution plan. *See* Docket No. 229. The Investor Group consists of 134 individuals and entities who purchased and continue

to own interests in one or more of the seven SRA Funds at issue in this litigation. *Id.* at 2. Collectively, they represent 75% of the shares in the SRA Funds. *Id.* at 3. The Court did not approve either of the proposed plans, instead ordering the parties to meet and confer regarding a number of issues relating to the receivership and the distribution of assets. *See* Docket No. 256.

In March 2018, the SEC and the Receiver filed an amended proposed joint distribution plan. *See* Docket No. 317. However, before any responses were filed, the Court denied without prejudice the SEC and the Receiver's motion to approve the amended joint plan because the claims process had still not been completed. *See* Docket No. 320. In August 2018, the Court set a schedule for the parties to exchange proposed distribution plans, meet and confer regarding the plans, and file an amended plan with the Court. *See* Docket No. 395.

The parties accordingly exchanged their respective plans, but were "deadlocked after two meet and confer sessions." Docket No. 404 at 1. On September 28, 2018, the SEC and the Receiver submitted a joint plan, which was "substantially the same" as the amended plan they had proposed in March 2018. *Id.* at 1 n.1. The Investor Group also submitted their alternative Investor Plan. *See* Docket No. 407. Global Generation Group ("Global") filed an objection to the Investor Plan. *See* Docket No. 406. Progresso Ventures ("Progresso") filed an objection to both proposed plans. *See* Docket No. 408.

The Court held an initial hearing on the proposed plans on October 23, 2018. During the hearing, the SEC alerted the Court that not only was the Equity Acquisition Corporation ("EAC") still in possession of certain shares that belonged to the receivership, but had also asserted claims against the receivership for a "purported guarantee by SRA Management of the two New York state court confessions of judgment (totaling $1.5 million) that Silverback Management, LLC provided to two purchasers of Badgeville, Inc. pre-IPO shares through the Silverback Funds." Docket No. 431 at 2. At the end of the hearing, the Court indicated that it was inclined to adopt a plan based on the one proposed by the SEC and the Receiver in light of several concerns: "the complexity of outstanding issues (including that EAC is resisting exchanging shares, and is in fact asserting $1.5 million in guarantees against Receivership entities . . .); the substantial risk of an asset shortfall; and the management structure proposed in the SRA Investor Group's plan."

Docket No. 413. However, the Court also noted that, "if something breaks and EAC comes to the table and all is made well and good, that could change the picture." Docket No. 419 at 58:13–15.

Accordingly, the Court ordered the parties to file an amended plan based on the SEC and Receiver plan that incorporated certain modifications spurred by the Court's comments on the proposed plan. *Id.* On November 21, 2018, the SEC submitted the responsive Joint Plan currently before Court, together with a proposed revised order to appoint a new Receiver upon approval of the Joint Plan. *See* Docket No. 420, Exhs. 1, 3.

However, two significant developments have since arisen. First, the Investor Group notified the Court that it had "resolved" the share exchange issue with EAC. Docket No. 432 at 1. "[A]s a result of [the Investor Group's] counsel's direct discussions with EAC, . . . . EAC is prepared to exchange its shares as agreed upon without any resolution of any of the other issues" regarding EAC's claim against the receivership. *Id.* At the December 13, 2018 hearing, the SEC acknowledged that EAC had put such an offer on the table, and stated that the SEC was preparing a stipulation that would allow the Receiver and EAC to consummate a share exchange. Second, and as a consequence of the first development, all parties are now in agreement that there will be no material shortfall in shares held by the SRA Funds once EAC delivers its shares. In fact, the parties estimate that there will be a *surplus* of approximately 148,000 shares in Palantir, which make up much of the value of the receivership assets.

B.   The Proposed Distribution Plans

The terms of the proposed Joint Plan and Investor Plan are briefly summarized below.

1.   Joint Plan

The Joint Plan is administered by the Receiver with the support of a Court-approved investment banker. *See* Docket No. 404 at 5. The Joint Plan proposes to create a consolidated pool of assets for distribution, consisting of the cash assets already on hand and the assets to be generated from "the orderly sale of the pre-IPO shares and financial interests held by the receivership entities, which could include holding the pre-IPO shares and financial interests for a period of time to maximize value." Docket No. 404 at 5; *see* Joint Plan at 14. The consolidated assets will then be distributed *pro rata* to investors and creditors alike, with all investors receiving

3

their original out-of-pocket investments and creditors receiving the debts they are owed. *See* Joint Plan at 14. The principal amounts of investors' and creditors' claims will be given the same priority, but the Joint Plan treats certain other components of creditors' claims (including interest, attorneys' fees, and costs) as "Subordinated Claim[s]" with lower priority. *See id.* at 9, 14–15.

In lieu of recovering under the regular schedule described above, investors and creditors can opt to claim an early distribution of their share amounting to 25–30% of the *pro rata* distribution they would otherwise receive. *See id* at 14. Any such early payouts will be funded by sales of pre-IPO shares held by the receivership entities, subject to the Court's approval. The Joint Plan also provides for distributions to claimants whose investments no longer have any value ("Rescission Claimants"). *See id.* at 8. Rescission Claimants will recover 25–30% of their original out-of-pocket investments. *See id.*

If proceeds remain after investors and creditors have received their distributions, the investors who held securities sold by the Receiver for a profit will receive *pro rata* shares of the excess funds. *See id.* at 15. Excess funds may also be used to additionally compensate claimants who opted for early payouts, as well as to cover Subordinated Claims. *See id.*

The thrust of the Joint Plan assumes liquidation of assets and is predicated on the assumption that there is an overall shortfall in shares due to Defendants' fraud. It also treats all investors—including those who invested in failed companies whose shares became worthless—as victims of the fraud and thus entitled to participate in the recovery.

2. The Investor Plan

The Investor Plan differs from the Joint Plan in two main respects. First, and most fundamentally, the Investor Plan proposes to allow investors to recover in the form of shares, rather than cash. Specifically, cash assets currently held by the receivership will be used to first pay outstanding administrative claims, and then outstanding claims of Square investors[1] and creditor claims on a *pro rata* basis. Otherwise, "[n]o securities held by the SRA Funds will be

---

[1] Some claimants who invested in Square shares had already received their share distributions from the Square IPO before the Receiver was appointed in this case, but the shares that had not been distributed were sold when the Receiver was appointed, so some Square investors have yet to receive their distributions. Docket No. 407 at 4 n.3.

sold until there are liquidity events and any lock-up periods have expired." Docket No. 407 at 7. At that point, shares necessary to pay any remaining administrative and creditor claims will be sold. *Id.* "All other shares will be distributed to investors in that particular portfolio company." *Id.* Under the Investor Plan, claimants do not have an early payout option, and Rescission Claimants (who invested in failed companies) will receive nothing.

Second, the Investor Plan calls for the receivership to be terminated and replaced by an "operational manager" and an "oversight officer." *See* Investor Plan at 3–4. The Investor Group proposes that Joshua Cilano, formerly a sales agent for Defendant Saddle River Advisors, should serve as the operational manager, and that Susan L. Uecker, a "respected and experienced fiduciary," should serve as the oversight officer. *Id.*

In contrast to the Joint Plan, the Investor Plan largely assumes that despite Defendants' fraud, there is no share shortfall and seeks to effectuate the investors' long-term investment goals, essentially by keeping the Funds in place and allowing for investor self-management. The Investor Plan also assumes the Recession Claimants who invested in failed companies were not affected by Defendants' fraud and hence are not entitled to recover anything from the Funds.

C. <u>Objections of Interested Parties</u>

Global and Progresso both object to the Joint Plan because it does not prioritize creditor claims over investor claims, and does not require that the "Subordinate Claim" portions of creditor claims be paid at all. *See* Docket No. 429; Docket No. 430. Both argue that as creditors, they should recover before investors in any distribution plan, on the full amount of their money judgments.

Global and Progresso also object to the provisions in the Investor Plan terminating the receivership. Global argues that the receivership affords the parties many protections that are not provided for in the Alternative Plan, that "institutional knowledge would be lost by terminating the Receiver," and that "the transition to Mr. Cilano and Ms. Uecker would be expensive" in terms of "start-up fees and costs." Docket No. 406 at 1–2. Global does not want Joshua Cilano managing the receivership assets (as contemplated by the Investor Plan) because he "was responsible for soliciting the investment of over $16 million of the approximately $53 million raised by

5

Defendants and their fraud," and the Investor Plan allows him to "benefit from Defendants' fraudulently-induced agreements." *Id.* at 2–3. Finally, Global protests that the Investor Plan does not provide for adequate oversight by the oversight officer over the operational manager. *See id.* at 3. Progresso shares the same concerns. *See* Docket No. 408 at 6–8.

## II. DISCUSSION

A. Distribution Scheme

In supervising an equitable receivership, the primary job of the district court is to ensure that the proposed plan of distribution is fair and reasonable. *S.E.C. v. Wealth Mgmt. LLC*, 628 F.3d 323, 332 (7th Cir. 2010) (citing *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. S.E.C.*, 467 F.3d 73, 84 (2d Cir. 2006)). The district court's "power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad." *S.E.C. v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986). That broad authority "arises out of the fact that most receiverships involve multiple parties and complex transactions." *Id*. The Court concludes that the fair and reasonable way forward in this case is to adopt a plan that distributes the receivership assets in the manner proposed by the Investor Plan—cash to creditors and shares to investors—under the governance of the receivership model proposed by the SEC.

In so concluding, the Court recognizes the unusual nature of this case. The SEC is correct that courts have typically endorsed a *pro rata* distribution from a "consolidated pool of assets" to repay victims of Ponzi-scheme frauds. Docket No. 404 at 2–3; *see S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88–89 (2d Cir. 2002) (holding that a *pro rata* distribution is particularly appropriate where the funds of defrauded investors were commingled and the victims were similarly situated with respect to the wrongdoing); *S.E.C. v. Byers*, 637 F. Supp. 2d 166, 176 (S.D.N.Y. 2009) (noting that *pro rata* distribution is generally the "most fair and most favored" approach in receivership cases). And liquidation of the receivership assets is often necessary to create the consolidated pool from which distributions are made. But this approach is the norm because "[i]t is typical in cases involving a receivership imposed on a corporate defrauder that the resources of the receivership estate are insufficient to allow all the victims of the fraud to recoup their losses."

*S.E.C. v. Credit Bancorp, Ltd.*, No. 99 CIV. 11395 RWS, 2000 WL 1752979, at *14 (S.D.N.Y. Nov. 29, 2000), *aff'd*, 290 F.3d 80 (2d Cir. 2002).

Here, in contrast, the claimants (other than Rescission Claimants) can still potentially be made largely whole because there is no material share shortfall. This unusual circumstance counsels in favor of a distribution plan, like the Investor Plan, that compensates the defrauded investors while still allowing them to fulfill their original investment objectives. The Investor Group, which "represents more than 75% of the money still invested in the SRA Funds," has repeatedly expressed that its members' objectives are best served by retaining their shares rather than by prematurely liquidating assets. Docket No. 407 at 2. Total liquidation of the receivership assets makes little sense where it is not necessary to provide recovery to the claimants, the assets are potentially much more valuable in share form,[2] and the majority of defrauded victims have a stated preference for keeping their shares. After all, "the ultimate goal of a receivership is to maximize the recovery of the investor class." *Wealth Mgmt.*, 628 F.3d at 336; *see Janvey v. Romero*, No. 3:11-CV-0297-N, 2015 WL 11017950, at *3 (N.D. Tex. Sept. 22, 2015) ("The goal of the receivership is to maximize the Receivership Estate's assets so that defrauded investors . . . can be made whole to the greatest extent possible.").

Three further considerations support adopting the Investor Group's proposed distribution scheme. First, it gives priority to creditor claims in full, thereby resolving Global's and Progresso's objections against the Joint Plan. Global and Progresso both opposed the aspects of the Joint Plan that placed the principal components of creditor claims on the same level as investor claims, while subordinating the remaining components, including interest, attorneys' fees, and costs. Indeed, the Joint Plan does not require that the subordinated portions of creditor claims be paid at all; these portions are paid only upon recommendation of the Receiver or the SEC if there are funds remaining at the end of the final round of distributions.[3] Joint Plan at 15. In contrast,

---

[2] The Investment Plan contemplates a substantial increase in the value of outstanding shares if the shares are held to maturity, a point not necessarily disputed by the SEC and Receiver.

[3] In arguing against this aspect of the Joint Plan, Progresso insisted that failing to award it the full amount of its judgment would "eviscerate[] full faith and credit." Docket No. 408 at 5. The Court notes that this argument is misplaced because Progresso's state-court judgment was against FB

7

creditors will be paid before investors under the Investor Plan. Once a liquidity event occurs for a portfolio company in the SRA Funds, share surpluses will be liquidated to the extent necessary to pay the creditor claims. Investor Plan at 6–7. Only then will investors receive their shares. *Id.* Moreover, the Investor Plan draws no distinctions between the different components of creditor claims, so creditors will recover the full amounts of their money judgments. The Investor Plan's priority scheme is generally consistent with the hierarchy of rights of creditors and equity owners in insolvency proceedings. *See Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd.*, 646 F.3d 401, 407 (7th Cir. 2011) ("[C]reditors are usually paid ahead of shareholders in insolvency proceedings, whether the proceedings take the form of bankruptcy . . . or of receivership.") (citations omitted). However, the Court in this circumstance is not bound by common solvency and bankruptcy principles. *Quilling v. Trade Partners, Inc.*, No. 103-CV-236, 2007 WL 107669, at *3 (W.D. Mich. Jan. 9, 2007) (recognizing that in overseeing a receivership, courts' "broad powers and wide discretion extend to allocating the priority of distributions from the receivership estate") (citation and internal quotation marks omitted); *In re Indian Motorcycle Litig.*, 307 B.R. 7, 16 (D. Mass. 2004) ("[I]n a receivership proceeding . . . this court sits in equity, and the allocation of priority lies within the trial court's sound discretion.").

Second, the Joint Plan's basis for providing a recovery for "Rescission Claimants"—investors whose investments failed due to market developments wholly unrelated to Defendants'

---

Management, not any of the receivership entities. *See* Docket No. 360-2; Docket No. 419 at 60. "The Federal Full Faith and Credit Statute, 28 U.S.C. § 1738, obliges federal courts to give the same preclusive effect to a state-court judgment as would the courts of the State rendering the judgment." *Fillet v. Fillet*, 996 F.2d 1224 (9th Cir. 1993). Under New York law, "[t]he doctrine of res judicata precludes a party from litigating a claim where a judgment on the merits exists from a prior action *between the same parties* involving the same subject matter." *Josey v. Goord*, 9 N.Y.3d 386, 389 (2007) (emphasis added). This Court has already found that privity has not been established between FB Management and the receivership entities. *See* Docket No. 385 at 10. Thus, the Receiver is not bound to give preclusive effect to Progresso's judgment against FB Management in distributing the Receivership assets.

All four cases Progresso cites in which receivers and bankruptcy courts have fully credited state court judgments, including fees and interest components, involved creditors asserting preclusion against the same parties that the state court judgments had been awarded against. *See Morris v. Jones*, 329 U.S. 545, 546–47 (1947); *In Re CWS Enterprises, Inc.*, 870 F.3d 1106, 1113 (9th Cir. 2017); *In re Ferrara*, 510 F. App'x 575, 575–76 (9th Cir. 2013); *In re Frontier Properties, Inc.*, 979 F.2d 1358, 1361 (9th Cir. 1992).

fraud—is dubious. The Joint Plan allows these investors to recover 25–30% of their out-of-pocket investments. Joint Plan at 9. But by the SEC's own definition, Rescission Claimants' losses were caused by "unrelated business developments," not Defendants' fraud. Docket No. 404 at 3. Those claimants' investments would have become worthless even if Defendants had invested and managed them exactly as promised. Allowing Rescission Claimants to recover, even at a reduced rate, would put them in a *better* position than if no fraud had occurred. Nonetheless, the SEC suggests that such recovery is merited under a rescission-type theory—that like other investors, Rescission Claimants were defrauded by Defendants' use and comingling of funds. This justification is problematic. Rescission is an equitable remedy that allows a party to a contract to disaffirm the contract on the basis of wrongdoing by the other party to the contract. *See, e.g.*, Cal. Civ. Code § 1689(b)(1) (allowing a party to unilaterally rescind a contract if its consent to the contract was "obtained through duress, menace, fraud, or undue influence, exercised by or with the connivance of the party as to whom he rescinds"). Thus, Rescission Claimants here might well have a rescission claim directly against Defendants. But allocating a portion of the receivership assets to Rescission Claimants would have no effect on *Defendants*, and would instead only serve to diminish the recovery of the other fraud *victims*. There is no equitable basis to benefit Rescission Claimants at the expense of other innocent claimants. *See United States v. Vanguard Inv. Co.*, 6 F.3d 222, 227 (4th Cir. 1993) ("[A] district court in its discretionary supervision of an equitable receivership may deny remedies like rescission and restitution where the equities of the situation suggest such a denial would be appropriate."). Put simply, vis-à-vis other investors (not the Defendants), there is no compelling equity favoring recovery by those who invested in failed companies.

Third, the early payment option contemplated in the Joint Plan and absent from the Investor Plan appears to be unnecessary. The Joint Plan allows the Receiver to liquidate shares as necessary to pay claimants who elect to receive an early recovery in exchange for accepting a reduced distribution. Joint Plan at 14. The Investor Plan does not allow any shares to be sold until the corresponding portfolio company has experienced a liquidity event, so there is no early payment option. Investor Plan at 7. The Investor Group represents that its members have no

9

desire to seek early payment of their claims. Thus, the Investor Plan appears to be more consistent with most investors' preferences.

Accordingly, the Court determines that the receivership assets shall be distributed in accordance with Sections E ("Use of cash funds currently held by the Receivership Estate"), F ("Calculation of accrued management fees, back-end fees and share surpluses upon the occurrence of a liquidity event"), and G ("Payment of eligible claims and other administrative expenses upon the occurrence of liquidity events") of the Investor Plan.

B. <u>Receivership</u>

However, the Court sees no reason to terminate the receivership and turn over administration of the receivership estate to an "operational manager" and "oversight officer" whose roles are vaguely defined in the Investor Plan. *See* Investor Plan at 3–4. The only justification the Investor Group advances for terminating the receivership is that the receivership is "expensive and unwieldy." Docket No. 407 at 10. The revised Proposed Receivership Order assuages this concern. The current Receiver has explained that the new Receiver will primarily "focus[] on pure distribution" because "a lot of the heavy lifting has been done" in terms of marshaling the receivership assets and ascertaining claims. Docket No. 419 at 47–48. As a result, receivership costs are expected to decrease moving forward. The Proposed Receivership Order underscores that the new Receiver will be more streamlined and focused on "implementation" of the distribution plan "in an effective and cost efficient manner." Docket No. 420, Exh. 3 at 1. It emphasizes that "[t]he Receiver shall strive to limit the fees and costs of the Receiver, the Receiver's firm and the Retained Personnel" in carrying out their duties. *Id.* at 3.

As the SEC points out, the Investor Group also overlooks the important benefits and safeguards that the receivership provides—the very benefits and safeguards that persuaded the Court to appoint the Receiver in the first place pursuant to the parties' stipulation. *See* Docket No. 142. For example, the Receiver is bound to "use Receivership Property for the benefit of the Receivership Estates," to ensure that it has no conflicts of interest, and to prosecute and defend actions as necessary for the benefit of the Receivership Estates. *Id.* at 4, 11, 12. The Investor Plan's governance model lacks these safeguards, a concern that both Global and Progresso voiced.

*See* Docket No. 406 at 2; Docket No. 408 at 6. Although this case is approaching the wind-down stage, much work remains to be done to marshal receivership assets, administer payments to vendors and creditors, and make decisions regarding investments and the timing of liquidations. This work should be done by a Receiver under the auspices and oversight of the Court. The Court also shares the SEC, Receiver, Global, and Progresso's concerns about the Investor Group's proposal to confer management responsibilities on Mr. Cilano, a former Saddle River Advisors broker.[4]

The Court adopts the SEC's recommendation to appoint Kathy Bazoian Phelps of the Diamond McCarthy LLP law firm as the new Receiver. *See* Docket No. 431 at 3. Ms. Phelps' written proposal, *see* Docket No. 431-1, and presentation at the December 13 hearing established her strong qualifications to oversee a complex receivership proceeding like this one. She has extensive experience serving as counsel for SEC-appointed receivers and bankruptcy trustees, and is particularly knowledgeable about the administration of Ponzi scheme recoveries. Ms. Phelps has agreed to bill her legal and professional work for the receivership at a discounted rate of $425 per hour, and administrative work at $130 per hour. Because she is an attorney herself, Ms. Phelps "will reduce costs by avoiding the need to have both the receiver and the receiver's counsel bill professional time for receivership and legal counsel work." Docket No. 431 at 3.

Accordingly, the Proposed Revised Order Appointing Receiver at Docket No. 420, Exh. 3 is **GRANTED**, with Ms. Phelps and the Diamond McCarthy firm appointed as the replacement Receiver.

///
///
///
///

---

[4] The Investor Plan advocates for Mr. Cilano to be appointed as the operational manager in charge of the day-to-day administration of the receivership estate, touting his investment experience and "institutional knowledge" of the SRA Funds. While the Court declines to adopt this governance model, Mr. Cilano, who is himself a member of the Investor Group, can still contribute his expertise to the Receiver as a member of the investment advisory committee.

11

## III. CONCLUSION

The SEC and new Receiver are hereby **ORDERED** to submit for the Court's approval, within thirty (30) days, a final distribution plan incorporating the distribution scheme outlined in Sections E, F, and G of the Investor Plan and the receivership governance structure outlined in the Joint Plan.

**IT IS SO ORDERED**.

Dated: December 20, 2018

EDWARD M. CHEN
United States District Judge